Robert W. JACKSON, III, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 433, 1999.

Supreme Court of Delaware.

Submitted: Sept. 12, 2000.
Decided: Feb. 8, 2001.
Reargument Denied May 15, 2001.

Thomas A. Foley and John S. Malik, Wilmington, Delaware, for appellant.

William E. Molchen and Thomas E. Brown, Department of Justice, Wilmington, Delaware, for appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices.

STEELE, Justice.

## I

Robert W. Jackson appeals the judgment of the Superior Court denying his Motion for Postconviction Relief following his 1993 conviction for the murder of Elizabeth Girardi.[1] Jackson argues that his conviction directly resulted from ineffective assistance of counsel and the State's intentional violation of *Brady v. Maryland*[2] when it failed to tell his counsel about an agreement between the State and Andre Johnson, a key State's witness. Jackson contends that this agreement implicitly granted Johnson future leniency for his testimony against Jackson. Because Jackson's arguments are without merit, we **AFFIRM.**

## II

On April 3, 1992, because they needed money to buy marijuana, Jackson's friend, Anthony Lachette, suggested that they rob a home in Hockessin, Delaware owned by Elizabeth Girardi. Lachette had been friends with the Girardi children and was familiar with the home.

Jackson and Lachette broke into the home through a porch door, grabbed items such as jewelry, rare coins, a camera and some compact discs and placed them into paper bags. As they were leaving the home, Elizabeth Girardi came upon them in her driveway. Lachette dropped his loot and fled, but Jackson remained, retrieved an axe from a shed and killed Girardi.

---

1. On April 28, 1993, following a jury trial lasting eleven days, the Superior Court sentenced Jackson to death. On July 26, 1994, this Court affirmed his convictions but vacated his death sentence and remanded the matter to the Superior Court for a new penalty hearing. *Jackson v. State*, Del.Supr., 643 A.2d 1360 (1994) cert. denied *Delaware v. Jackson*, 513 U.S. 1136, 115 S.Ct. 956, 130 L.Ed.2d 898 (1995). On October 26, 1995, following a second penalty hearing, the Superior Court, again, sentenced Jackson to death, and this Court affirmed. *Jackson v. State*, Del.Supr., 684 A.2d 745 (1996) cert. denied. *Jackson v. Delaware*, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997). On August 21, 1997, Jackson filed a motion for post-conviction relief pursuant to Rule 61, which he amended on September 22, 1997. On August 25, 1999, the Superior Court denied Jackson's motion for post-conviction relief.

2. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The police investigation led to Jackson and Lachette after Jackson's roommate, James Burton, sold a bracelet taken during the burglary to a pawnbroker who then contacted the police. Lachette and Burton denied any involvement in Girardi's murder but told police that Jackson had bragged about killing Girardi. Other evidence placed Jackson at the crime scene. The police matched Jackson's sneaker tread to two footprints at the crime scene, found a camera, some coins and other items from the burglary in Jackson's apartment and found two carpet fibers at the entry of Girardi's home that matched fibers from Jackson's car.

The police arrested Jackson and Corrections placed him in Gander Hill prison. While there, he befriended another inmate, Andre Johnson, who was in Gander Hill in default of bail after an arrest on July 2, 1992 for burglary, theft and weapons charges. During their developing acquaintance, Jackson sought Johnson's assistance in a plan to murder Burton in order to prevent Burton from testifying against him. Johnson posted bail on August 27, 1992. Jackson later mailed him a photograph of Burton, a letter and a map showing where Burton lived.

On September 25, 1992, Johnson went to prosecutors and revealed Jackson's plan, giving them the photograph of Burton, the letter and the map to Burton's house. The police found Jackson's fingerprints on the letter and the map.

Johnson testified for the prosecution at Jackson's trial about the plan to murder Burton. Johnson stated that he had been given immunity for his involvement in the murder plan but stated that he had no agreement with the prosecutors for leniency on the burglary, theft and weapons charges. Later, Johnson moved to dismiss the burglary, theft and weapons charges on the theory that he had been granted immunity on those charges, as well, for his cooperation in Jackson's case.

On March 11, 1994, Superior Court held a hearing to determine whether the State promised Johnson immunity for the burglary, theft and weapons charges in exchange for his testimony against Jackson. Timothy Barron, the lead prosecutor in Jackson's case, testified that after Johnson contacted him, he invited Johnson to his office that day, then called in Robert O'Neill, the other prosecutor assigned to Jackson's case, Lt. Dennis Godek, commander of the detective division of the New Castle County police and Scott McLaren, the chief investigator in Jackson's case.

When Johnson arrived, Barron interviewed him alone for a few minutes to assess Johnson's allegations. Barron stated that he told Johnson at that time that the prosecutors could not offer him leniency on the burglary, theft and weapons charges in exchange for his testimony against Jackson and that Johnson stated that he understood this. Johnson, on the other hand, testified that during this initial conversation alone with Barron, Barron offered him leniency for his cooperation but told Johnson not to tell anyone.

Barron next called O'Neill, Godek and McLaren into his office where Johnson provided more details regarding his conversations with Jackson about the plan to murder Burton. Barron testified that during that interview, McLaren asked Johnson what he expected in exchange for his cooperation. Johnson replied that he did not want anything, but that he was not willing to participate in a plan to murder a witness. Barron testified that although Johnson did not explicitly state that he expected leniency, Barron suspected that Johnson had a subjective expectation of leniency. Barron also testified that although he offered Johnson no leniency,

Barron was prepared to obtain "some kind of thank you treatment by the State."[3] In fact, in 1993, Barron convinced senior prosecutors to authorize a plea offer to Johnson for a recommended sentence of twenty-five years imprisonment instead of the potential life sentence that Johnson could have received as an habitual offender after conviction for the burglary, theft and weapons charges.

On May 6, 1994, at a Superior Court hearing, Godek testified that during the September 25, 1993 meeting with Johnson, Barron told Johnson he could not offer him leniency but if Johnson continued to cooperate, there may be consideration for leniency in the future but Johnson had to understand that no promises could be made until prosecutors resolved the entire matter with Jackson.

McLaren testified that when Barron told Johnson that he could offer Johnson no leniency, Johnson replied, "We're all intelligent people in this room."[4] Jackson contends that Johnson's statement shows that Johnson understood that, while no explicit terms had been offered at that time, his cooperation in Jackson's case would lead to leniency in the future. The State argues that Johnson's statement simply shows that Johnson may have held a subjective hope for future leniency. The State contends that, because the State cannot discern Johnson's subjective thoughts, the State had no obligation to relay this information to Jackson.

The State contends that, at no time, did prosecutors offer Johnson a promise of leniency on the burglary, theft and weapons charges for his cooperation against Jackson. The State only offered immunity for potential charges arising from the plan to murder Burton. In fact, Barron testified that his policy is to refrain from presenting witnesses at trial to whom he has promised leniency because this information would damage the witnesses' credibility. Barron stated that he "would never have somebody come into the court to testify on behalf of the State where the State had given that person some kind of a deal because whatever deal that would be would go against the credibility of the witness."[5] Even Johnson's attorney at that time, Jerome Capone, acknowledged that prosecutors offered Johnson no formal deal for leniency in exchange for cooperative testimony in Jackson's case.

On August 25, 1999, the Superior Court denied Jackson's motion for postconviction relief, finding no basis for his ineffective assistance of counsel argument[6] and that Super.Ct.Crim.R. 61(i)(3) procedurally barred Jackson's *Brady* claim. The Superior Court then stated:

> assuming, *arguendo*, that there was some kind of implied agreement between [Johnson] and the State, in order to be entitled to a new trial for the State's failure to disclose [the implicit agreement with Johnson], Jackson must also show that in light of all the evidence, including that untainted by the *Brady* violation, it is reasonably probable that the jury would have entertained a reasonable doubt regarding his guilt. *United States v. Bagley,* 473 U.S. 667, 683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In this case, the State presented overwhelming evidence of Jackson's guilt in the Girardi murder. The State also proved, with two independent witnesses and physical evidence, that Jack-

---

**3.** Appendix to Appellant's Opening Brief at A–34, *Jackson v. State* (No. 433, 1999).

**4.** Appendix to Appellant's Opening Brief at A–47, *Jackson v. State* (No. 433, 1999).

**5.** Appendix to Appellant's Opening Brief at A–32, *Jackson v. State* (No. 433, 1999).

**6.** The factual support for the Superior Court's conclusion will be reviewed in Part III *infra.*

son planned to murder Burton. Because [Johnson's] testimony was merely cumulative evidence tending to circumstantially prove Jackson's culpability in the Girardi murder, it is not reasonably probable that the jury would have entertained a reasonable doubt regarding [Jackson's] guilt.[7]

In other words, the Superior Court found that, even if Jackson had known of and used the Brady material at trial, the jury would still have found him guilty. While this Court affirms the Superior Court, we believe the portion of its holding interpreting *Brady* requires clarification; however, before we address Jackson's argument that the State intentionally violated *Brady*, we address his other arguments.

### III

#### A. Ineffective assistance of counsel

Jackson presents three arguments based on ineffective assistance of counsel. They are: trial counsel had only sixteen days to prepare for trial, which amounted to ineffective assistance of counsel, *per se*; trial counsel failed to conduct independent forensic tests of the physical evidence; and trial counsel failed to object to certain propensity testimony that Jackson argues was inadmissible under D.R.E. 404. We find no merit to any of these arguments.

#### 1. Trial counsel's trial preparation time of sixteen days

 Jackson argues that he was denied adequate representation because his trial counsel did not have sufficient time to prepare for a capital murder trial. This argument does not involve any specific allegations of ineffectiveness, rather Jackson argues that because *one of two* trial counsel was appointed sixteen days before jury selection began, this amounts to ineffective assistance of counsel, *per se*, citing *United States v. Cronic*.[8] *Cronic* outlines a five-factor test to assess the impact of the tardy appointment of counsel.[9] Jackson argues that the facts surrounding tardy appointment of counsel in his case fulfills the first requirement for meeting ineffective assistance of counsel under *Strickland v. Washington*, [10] namely that trial counsel's actions fell below an objective standard of reasonableness.

After Jackson's initial private attorney withdrew on October 5, 1992 and the Office of the Public Defender determined that it had a conflict of interest, the Superior Court appointed Jerome M. Capone and Kevin J. O'Connell as Jackson's trial counsel on November 16, 1992. Capone later withdrew after learning that another one of his court-appointed clients, Johnson, would be a key State's witness in the Jackson case. Remarkably, Capone had been appointed *Jackson's* counsel *before* his appointment to represent *Johnson.* Upon recognizing that he had been appointed to represent both Jackson and Johnson, Capone withdrew from representing *Jackson.*[11] On February 22, 1993,

---

7. *State v. Jackson*, Del.Super., Cr.A. Nos. IN92–04–1222–R1 through 1227–R1; IN92–04–1348–R1 & 1349–R1, Bifferato, J. (Aug. 25, 1999) Mem.Op. at 28.

8. 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

9. *Cronic*, the United States Supreme Court listed five factors for assessing the impact of tardy appointment of counsel: (1) the time afforded for investigation and preparation; (2) the experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel. *Id.* at 652, 104 S.Ct. 2039.

10. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

11. While there is no evidence that Capone actually completed any work for Jackson, and

the Superior Court appointed Laurence I. Levinson as co-counsel, sixteen days before jury selection.

Jackson refers to the events leading to trial to support his argument that trial counsel had inadequate time to prepare a defense, thereby establishing that trial counsel's actions could not have met an objective standard of reasonableness. For example, as of January 5, 1993, trial counsel had not received a transcript of the proof positive hearing. Two days later (almost two months after assignment), O'Connell met Jackson for the first time. O'Connell filed his first written request for discovery on February 4, 1993. O'Connell filed a motion to compel on February 16, 1999 specifically asking for any FBI or forensic reports. The Court had set trial for March 10, 1993.

. There is no presumption that trial counsel was ineffective simply because the court appointed Levinson as co-counsel sixteen days before jury selection. Jackson's trial counsel never requested a continuance, and Jackson did not raise this issue until he filed his motion for postconviction relief. In fact, the Superior Court cites statements made by O'Connell, with Levinson agreeing, that he had "ample time to prepare a defense strategy, hire forensic experts, review the evidence, investigate critical factual/legal parts of the case, and to, in general, be prepared for this trial." [12]

▆ Moreover, even though Jackson claims that an assessment of the five factors in *Cronic*[13] results in a conclusion that trial counsel's actions could not have met an objective standard of reasonableness, he fails to show how the appointment of counsel sixteen days before trial meets the second requirement of *Strickland*, that trial counsel's deficiencies were so prejudicial that they deprived him of a fair trial.

Jackson argues that because the Superior Court appointed trial counsel so close to the trial date that trial counsel could not conduct independent forensic testing to determine if the test results were favorable to Jackson. Jackson concedes trial counsel did not request a continuance for that or any other purpose, explaining that his trial counsel, "as contract attorneys," [14] were reluctant to seek continuances. This may well explain why trial counsel did not ask for a continuance. It fails, nonetheless, to show how that omission so prejudiced. Jackson that he was denied a fair trial.

## 2. Trial counsel's failure to conduct independent forensic tests

▆ Jackson argues that trial counsel were ineffective because they failed to hire independent forensic experts necessary to

there is no evidence that Capone compromised Jackson in any way, although that possibility should not be minimized given the relationship between Jackson and Johnson, the Court strongly suggests that counsel avoid this practice. When counsel recognized that he had been representing the defendant and now had been appointed to represent a key state's witness in a trial where his former client stood accused of murder, counsel should not have continued to represent either · Jackson or Johnson.

**12.** *State v. Jackson,* Del.Super., Cr.A. Nos. IN92–04–1222–R1 through 1227–R1; IN92–

04–1348–R1 & 1349–R1, Bifferato, J. (Aug. 25, 1999) Mem.Op. at 10. This record demonstrates that it would be impractical to establish a bright-line rule regarding timing of court-appointed counsel, however, we suggest that counsel and the trial court should carefully evaluate the potential adverse consequences of appointment of new counsel (even co-counsel) sixteen days before trial.

**13.** *See supra* n. 8.

**14.** Appellant's Op. Br. at 24, *Jackson v. State* (No. 433, 1999).

conduct a proper defense. This omission, as Jackson sees it, is independent of the argument above about tardy appointment of co-counsel. Jackson concedes from the outset of his argument, however, that he is "hard pressed to articulate what exactly trial counsel would have discovered if they had requested and been granted funds for independent forensic tests of the physical evidence and such tests had been conducted before trial." [15]

The Superior Court correctly found that trial counsel's representation fell well within the range of professionally competent assistance because the record shows that trial counsel made a reasonable tactical decision not to hire or consult additional forensic experts to test the physical evidence placing Jackson at the scene of the crime.

The Superior Court discussed the strong evidence that not only placed Jackson at the scene of the crime but also implicated him in the murder of Girardi: the fact that Jackson presented no alibi for his whereabouts on the day of the murder; several witnesses stated that Jackson bragged about killing Girardi; several witnesses saw the fruits of the burglary in Jackson's apartment; and, a witness stated he saw Jackson place a bloody glove in a garbage can. In fact, trial counsel consulted a shoe print expert and admitted that the results were not favorable to Jackson.

The Superior Court correctly found that "[f]aced with this evidence, it was not improper for counsel to forgo further forensic testing of the crime scene evidence. Rather, the Court concludes that counsel made

a reasonable tactical decision to forgo such testing in order to focus their efforts on creating a reasonable doubt about Jackson's guilt." [16]

### 3. Failure to object to Lachette's testimony

On direct examination, the State asked Lachette, "What were your thoughts when you and the defendant were talking about doing a burglary, a house burglary?" [17] Lachette responded, "I originally wasn't going to do it. It was something he did, I don't want to say as a habit, *but it was something that he often did.*" [18] Jackson argues that because trial counsel did not object to Lachette's response and move for a mistrial that he did not receive a fair trial.

The Superior Court correctly found this issue procedurally barred under Super.Ct.Crim.R. 61(i)(3). Even if this claim were not barred by Rule 61, the mere fact that trial counsel did not object does not constitute ineffective assistance of counsel. First, Lachette did not respond to the question as asked, and, thus, trial counsel could not have objected before Lachette gave his response. Second, and more importantly, trial counsel may have made the tactical decision to remain silent rather than draw attention to Lachette's response by emphasizing it with an objection. Jackson fails to show how trial counsel's omission so prejudiced him that he did not receive a fair trial.

In summary, even if Jackson's appointment of counsel scenario implicates *Cronic* and it can be said that counsel appeared to

---

**15.** Appellant's Op. Br. at 26, *Jackson v. State* (No. 433, 1999).

**16.** *State v. Jackson*, Del.Super., Cr.A. Nos. IN92–04–1222–R1 through 1227–RI; IN92–04–1348–R1 & 1349–R1, Bifferato, J. (Aug. 25, 1999) Mem. Op. at 15.

**17.** Appellant's Op. Br. at 30, *Jackson v. State* (No. 433, 1999).

**18.** *Id.*

be appointed too close to trial, Jackson cannot persuade us that that tardiness so prejudiced him that he did not receive a fair trial or that counsel were so otherwise deficient in their representation that they failed at trial to provide him adequate assistance.

## B. Superior Court's denial of Jackson's request for funding for forensic tests

■ Jackson argues that the Superior Court abused its discretion by denying his request for state funds to conduct independent forensic tests. The decision to grant or deny funds for investigative services is within the discretion of the Superior Court. Jackson must show that the expenditure of public funds is reasonably necessary for the preparation of an adequate defense. We will not disturb the trial court's ruling "unless there is a clear and convincing showing of substantial prejudice as a result of the denial of funds for investigative services." [19]

Since Jackson presented no evidence of prejudice as a result of trial counsel's tactical decision not to conduct independent forensic tests, the Superior Court did not abuse its discretion by denying Jackson's request for *postconviction funding* to conduct similar tests.

## C. The Alleged Brady Violation

■ Jackson argues that the prosecution failed to inform him that they had implicitly promised Johnson future leniency for his testimony about Jackson's plan to murder Burton and thus failed to comply with *Brady*.

Jackson concedes that the State conveyed no explicit promise of immunity to Johnson on his pending burglary, theft and weapons charges, nor did the State promise him any formal "deal" in exchange for his cooperation. Jackson argues, however, that the State violated *Brady* by failing to inform him about the implicit promise prosecutors made Johnson of future leniency for his favorable testimony.

While the State agrees that its agents interviewed Johnson extensively regarding Jackson's murder plan, it denies that they ever communicated to Johnson that prosecutors would grant him any leniency except immunity for his involvement in the Burton murder plan. At a hearing in Johnson's case, in which he asserted that the State had promised him leniency, the State maintained that for tactical reasons they did not offer Johnson leniency because that would undermine his credibility.

We find clear record support for the proposition that the State did, implicitly, promise Johnson leniency on the burglary, theft and weapons charges and we conclude that the State should have informed Jackson's counsel about that implicit promise. That information had the potential to undermine Johnson's credibility by exposing his motive or bias. With that information, Jackson could have made the jury aware that the State implicitly promised Johnson possible future leniency and that the expectation (based upon performance) may have affected his testimony and therefore their assessment of his credibility. Notwithstanding this *Brady* violation and the troubling nature of the State's avowed practices, the ultimate issue in this case is whether the failure to disclose the clandestine implicit promise of future leniency could reasonably be taken to put the whole case in such a different light as to under-

19. *Dennis v. State*, Del.Supr., No. 428, 1991, Moore, J. (April 26, 1993) (order) (citing *Van Arsdall v. State*, Del.Supr., 486 A.2d 1, 14 (1984), *rev'd on other grounds*, 524 A.2d 3 (1987)).

mine confidence in the verdict.[20] We find that it would not.

## D. Cross-examination on Bias

 Effective cross-examination is essential to a defendant's right to a fair trial.[21] It is the "principal means by which the believability of a witness and the truth of his testimony are tested ."[22] Under Delaware law, "the jury is the sole trier of fact, responsible for determining witness credibility and resolving conflicts in testimony."[23] Jurors should have every opportunity to hear impeachment evidence that may undermine a witness' credibility.

 An important form of impeachment during cross-examination is to expose a witness' bias, prejudices or motives.[24] "Cross examination on bias is an essential element of the right of an accused under the Delaware constitution to meet the witnesses in their examination,"[25] which makes it "an essential element of the constitutional right of confrontation."[26] Moreover, "[e]vidence of bias is always admissible to impeach a witness."[27]

 "Evidence [that] the defense can use to impeach a prosecution witness by showing bias or interest ... falls within the *Brady* rule."[28] It falls within the *Brady* rule because "such evidence is 'evidence favorable to an accused' so that, if disclosed and used effectively, it might make the difference between conviction and acquittal."[29] This is because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. Indeed, it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."[30]

 The Superior Court barred Jackson's *Brady* violation claim under Super.Ct.Crim.R. 61(i)(3). Jackson argues that the bar to his claim under that provision is inapplicable under 61(i)(5). When the *Brady* rule is violated, postconviction relief can not be barred by Rule 61(i)(3) because a *Brady* violation undermines the fairness of the proceeding leading to the judgment of conviction. Because *Brady* vi-

20. *See Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (finding a different result reasonably probable because the suppressed evidence was the "essence of the State's case.") *Id.* at 441, 115 S.Ct. 1555. *See also Michael v. State*, Del. Supr., 529 A.2d 752, 758 (1987) (finding no reasonable probability that the result of the trial would have been different).

21. *See Davis v. Alaska*, 415 U.S. 308, 320, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *McGriff v. State*, Del.Supr., 672 A.2d 1027 (1996); *Fensterer v. State*, Del.Supr., 493 A.2d 959 (1985).

22. *Fensterer* at 963 (citing *Davis* at 316, 94 S.Ct. 1105).

23. *Johnson v. State*, Del.Supr., No. 42, 1999 (Aug. 4, 1999) (ORDER) (citing *Tyre v. State*, Del.Supr., 412 A.2d 326, 330 (1980); *Pryor v. State*, Del.Supr., 453 A.2d 98, 100 (1982)).

24. *See Davis* at 315–316, 94 S.Ct. 1105.

25. *Van Arsdall*, Del.Supr., 524 A.2d 3, 6 (1987).

26. *Wintjen v. State*, Del.Supr., 398 A.2d 780, 781 (1979) (citing *Davis* at 316, 94 S.Ct. 1105; *Ward v. State*, Del.Supr., 366 A.2d 1194, 1196 (1976)).

27. *Allen v. State*, Del.Supr., 644 A.2d 982, 986 (1994) (citing *Weber v. State*, Del.Supr., 457 A.2d 674, 680 (1983)).

28. *Michael v. State*, Del.Supr., 529 A.2d 752, 756 (1987) (citing *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)).

29. *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

30. *Id.* (citing *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)).

olations strike at the core of a fair trial, the consequences of a failure to comply with *Brady* must be examined carefully.

## E. The Expansion of Brady

The suppression of material evidence violates *Brady*. In *United States v. Bagley*,[31] the United States Supreme Court expanded *Brady's* "materiality" test, holding that "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' "[32]

In *Kyles v. Whitley*,[33] the United States Supreme Court further expanded *Bagley's* definition of materiality. The *Kyles* Court held that while a *Brady* violation is "triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,"[34] but rather whether in the absence of the undisclosed evidence the defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence."[35] Thus, according to the *Kyles* Court, a " 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial."[36]

The *Kyles* Court also held that materiality is not a "sufficiency of the evidence test."[37] In order to reverse a conviction based upon a *Brady* violation, one must "show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[38]

In this case, impeaching Johnson on bias may have been helpful or important to Jackson's case, even where the evidence, as presented, appeared to show that the State made no more than an implicit promise to Johnson regarding future leniency. The jury may well have been troubled, as are we, by an acknowledged and disingenuous prosecutorial practice of implicitly suggesting future possible leniency while maintaining that no actual promise of leniency had been made in order to avoid tainting a witness' credibility because of self-interest. The jury might well expect that, given their own life experiences with human nature, the "implicit" promise might enhance the propensity of a witness, hopeful of leniency if his testimony meets with the prosecutor's approval, to embellish his testimony in order to increase the likelihood of favorable treatment. The insidious nature of the practice would be obvious to all but the most gullible of jurors.

 Despite our concern that the prosecutors' tactics denied the jury the op-

---

**31.** 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

**32.** *Kyles,* 514 U.S. at 433, 115 S.Ct. 1555.

**33.** 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

**34.** *Id.* at 434, 115 S.Ct. 1555.

**35.** *Id.*

**36.** *Id.* (citing *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

**37.** *Id.* at 435, 115 S.Ct. 1555.

**38.** *Id. But see Dawson v. State,* Del.Supr., 673 A.2d 1186, 1193 (1996) (stating after comparing *Brady* material to other evidence in case that "[o]n these facts, there is no reasonable probability that the outcome would have been different if the changed testimony had been disclosed sooner").

portunity to evaluate fully and fairly Johnson's credibility, the potential for Johnson's credibility to be impeached did not put the case in such a light "as to undermine confidence in the verdict." [39] Here, overwhelming evidence established Jackson's guilt. As noted *supra*, the Superior Court discussed the evidence that not only placed Jackson at the scene of the crime, but also implicated him in the murder of Girardi: the fact that Jackson presented no alibi for his whereabouts on the day of the murder; several witnesses stated that Jackson bragged about killing Girardi; several witnesses saw the fruits of the burglary in Jackson's apartment; and, a witness stated he saw Jackson place a bloody glove in a garbage can. In fact, trial counsel admitted, after consulting a shoe print expert in the hope of negating the State's sneaker print evidence of Jackson's presence at the scene, that the results were not favorable to Jackson. Further, and perhaps even more importantly, evidence independent of Johnson's oral recitation of Jackson's request that he kill Burton corroborated his testimony. The State presented independent evidence establishing that Jackson's handwriting matched the handwriting on the letter Johnson presented to the prosecutors and that Jackson's fingerprints were on both the letter to Johnson with information about Burton and the map to Burton's residence. It is difficult to imagine a more powerfully persuasive set of corroborating circumstances.

In conclusion, we must find that the State violated *Brady* because the State's agents failed to inform Jackson's counsel that they implicitly promised Johnson future leniency on unrelated charges for his testimony about Jackson's plan to murder Burton. Despite, however, the State's offensive policy of eschewing plea agreements to avoid damage to witness credibility in favor of "implicit" future leniency, we affirm Jackson's conviction. We must because both the evidence corroborating Johnson's testimony and the circumstantial evidence supporting Jackson's presence at the scene and participation in the crime overwhelms any perceived lack of "confidence in the outcome of the trial." [40] Jackson's trial, we conclude, resulted in a "verdict worthy of confidence." [41]

The Superior Court's decision denying the Motion for Postconviction Relief is **AFFIRMED**.

---

**39.** *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555.

**40.** *See Kyles*, 514 U.S. at 434, 115 S.Ct. 1555 (citing *Bagely*, 473 U.S. at 678, 105 S.Ct. 3375).

