# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. # 1311003232 |
| | ) | |
| LAQUAN GIBSON, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: September 15, 2017
Decided: December 19, 2017

**Upon Defendant's Motion for Postconviction Relief: DENIED**

This 19th day of December, 2017, upon consideration of Defendant's Motion for Postconviction Relief (the "Motion") under Superior Court Criminal Rule 61 ("Rule 61") and the record in this case, it appears to the Court that:

## FACTUAL AND PROCEDURAL BACKGROUND

1. On January 15, 2015, Laquan Gibson was convicted of Tier II Drug Dealing, Possession of Firearm by Person Prohibited, and Possession of Marijuana. The convictions stemmed from a search of Gibson's home and car on November 5, 2013. A confidential informant ("CI") told Detective Joseph Leary that Gibson placed controlled substances and weapons in his Ford Taurus. Gibson was on probation at the time, and Detective Leary therefore alerted Probation Officer Kate Sweeney, who applied for and received an administrative warrant to search Gibson's home at 716 East 6th Street, Wilmington, Delaware.

2. When Detective Leary and Officer Sweeney went to Gibson's residence, a female, later identified as Idamae Stallings, informed them Gibson was not home. As the officers searched the home, Gibson returned and was apprehended by Officer Brian Vettori, who remained outside as security. While searching the home, the officers recovered a handgun, multiple bags of marijuana, a bag containing white powder, and keys to a Ford Taurus and a Mercury Mountaineer. Detective Leary called a K-9 unit to search the cars based on the CI's tip that Gibson stored drugs and weapons in his Taurus. After the K-9 detected drugs in the Taurus, Detective Leary had the cars towed and obtained a warrant to search the vehicles. The vehicle search uncovered a bag of heroin in the Mountaineer and 202 bags of heroin in the Taurus.

3. When the officers searched Gibson at the Wilmington police station, they found $340 in cash on his person. During a post-*Miranda* interview, Gibson admitted the guns and drugs belonged to him, and that he placed the drugs in the cars approximately a week and a half before the search. In early 2014, shortly after the officers sent the drugs to the Office of the Chief Medical Examiner ("OCME") for analysis, allegations of evidence tampering engulfed the OCME. The drugs were then sent to NMS Labs for analysis.[1] In compliance with this Court's ruling

---

[1] It does not appear the drugs ever were analyzed at OCME.

in *State v. Irwin*,[2] the State also sent the drugs to the newly-created Division of Forensic Science ("DFS"), where they were analyzed by Patricia Phillips. The DFS and NMS Labs drug reports both confirmed the presence of marijuana and heroin.

4.     At trial, Gibson was represented by counsel ("Trial Counsel"). Before trial, Gibson stipulated to the chain of custody and admission of the drug reports into evidence. Trial began on January 13, 2015. At trial, Gibson recanted his post-*Miranda* confession and alleged the drugs belonged to his recently-deceased friend, Jason Turner. Gibson alleged Turner lived at his house and stored drugs there. On cross-examination, the State questioned why Gibson did not accuse Turner until after his death, whereupon Gibson denied knowing Turner had died. Gibson testified he did not keep in regular contact with people outside prison and did not make frequent phone calls. The State then further questioned Gibson's credibility by showing Gibson made forty-five calls just in the month of October. The State then asked:

> THE STATE: And never in those calls it came up that your close boy, Jason Turner, was killed?
> THE DEFENDANT: No, sir.[3]

5.     The jury found Gibson guilty of Tier II Drug Dealing, Possession of a Firearm by Person Prohibited, and Possession of Marijuana. Gibson appealed to

---

[2] 2014 WL 6734821, *11 (Del. Super. Nov. 17, 2014).
[3] *State v. Gibson*, ID No. 1311003232, at 80 (Del. Super. Jan. 14, 2015) (TRANSCRIPT).

3

the Supreme Court, which affirmed his conviction on March 11, 2016. Gibson filed a *pro se* motion for postconviction relief on April 25, 2016. The Court appointed counsel to represent Gibson, and counsel filed an amended Motion on April 3, 2017.

6.     In his amended Motion, Gibson alleges he is entitled to relief because (1) the State engaged in misconduct that prejudicially affected his substantial rights, and (2) Trial Counsel was ineffective. As to prosecutorial misconduct, Gibson first argues the State withheld impeachment evidence related to Phillips and the drug tests in violation of *Brady v. Maryland*.[4] Second, Gibson argues the State withheld the records of his October 2014 prison phone calls in violation of Superior Court Criminal Rule 16. Third, he contends the State made improper comments during Gibson's cross-examination. As to Trial Counsel's performance, Gibson argues Trial Counsel was ineffective because he (i) failed to request a recess to review Gibson's October prison calls when the existence of those calls was raised at trial, and (ii) failed to object to the State's improper editorialization during Gibson's cross-examination.[5] Trial Counsel supplemented the record and

---

[4] 373 U.S. 83 (1963).
[5] Gibson further argues he is entitled to an evidentiary hearing. Under Super. Ct. Crim. R. 61(h)(3), the Court may determine whether a hearing is desirable or justice dictates a disposition without an additional hearing. The record in this case is well-developed and most of Gibson's claims procedurally are barred. I therefore conclude no evidentiary hearing is necessary.

4

responded to the Motion by affidavit.[6] The State also filed a brief opposing the Motion.

## ANALYSIS

### A. Procedural Bars to Gibson's claims

7.    Before addressing the merits of any claim for postconviction relief, this Court first must determine whether the motion procedurally is barred under Rule 61.[7] A motion for postconviction relief may be barred for timeliness and repetition, among other things. A motion filed under Rule 61 is untimely if it is filed more than one year after a final judgment of conviction.[8] A defendant also is barred from filing successive motions for postconviction relief.[9] The rule further prohibits motions based on any ground for relief that was not asserted in the proceedings leading up to the judgment of conviction, unless the movant demonstrates "cause for relief from the procedural default" and "prejudice from violation of the movant's rights."[10] Finally, the rule bars consideration of any ground for relief that previously was adjudicated in the case.[11]

---

[6] D.I. 84.
[7] *Bailey v. State*, 588 A.2d 1121, 1127 (Del. 1991); *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).
[8] Super. Ct. Crim. R. 61(i)(1).
[9] *Id.* 61(i)(2); *see id.* 61(d)(2)(i)-(ii) (regarding the pleading requirements for successive motions).
[10] *Id.* 61(i)(3).
[11] *Id.* 61(i)(4).

8. Gibson's Motion was filed less than a year after his sentence, and it therefore is timely. This is Gibson's first motion for postconviction relief, and the Motion therefore is not barred as successive. Gibson's claims of ineffective assistance of counsel could not be raised at an earlier stage in the proceedings.[12] As to Gibson's claims of prosecutorial misconduct, however, all his arguments, save one, could have been raised at trial and on direct appeal. That is, Gibson did not object at trial or on appeal to the State's alleged improper editorialization during Gibson's cross-examination and did not object at trial or on appeal to the State's failure to provide Trial Counsel with the recordings of Gibson's prison calls from October 4, 2014 through October 29, 2014. Because Gibson did not raise these allegations at trial or on his direct appeal to the Supreme Court, they are barred under Rule 61(i)(3). Gibson has not shown cause why he should be relieved of this procedural default, nor has he pleaded that the bars are inapplicable under Rule 61(i)(5).

9. The Motion, however, does argue Gibson was unaware of the impeachment evidence related to Phillips before his appeal and therefore had "cause" for his failure to timely raise the argument.[13] Accordingly, the Court may

---

[12] *Whittle v. State*, 138 A.3d 1149 (Del. 2016); *State v. Evan-Mayes*, 2016 WL 4502303, at *2 (Del. Super. Aug. 25, 2016).

[13] Although I ultimately conclude the non-disclosure of Phillips' disciplinary record was not a *Brady* violation, that conclusion necessarily turns on the merits of Gibson's Motion. The argument itself is not barred procedurally under Rule 61. *See Jackson v. State*, 770 A.2d 506, 515-16 (Del. 2001) ("When the *Brady* rule is violated, postconviction relief can not be barred by

6

consider the merits of Gibson's claims related to Phillips, along with the ineffective assistance of counsel claims.

## B. Nondisclosure of Phillips' misconduct was not a *Brady* violation.

10.    Gibson argues the State violated *Brady* by failing to disclose impeachment evidence related to Phillips.  When applying *Brady*, the Delaware Supreme Court has held a "prosecutor must disclose all relevant information obtained by the police or others in the Attorney General's Office to the defense" and uphold its duty "to learn of any favorable evidence known to the others acting on the government's behalf in the case . . . ."[14]  Gibson argues Phillips' drug tests formed the basis of the charges against him, and disclosure of her misconduct may have been the difference between conviction and acquittal.  Gibson notes that eleven weeks before DFS tested the substances in his case, Phillips engaged in questionable evidence-handling that resulted in two Corrective Action Request Forms filed against her.[15]  Gibson argues that, had the State disclosed Phillips' misconduct, Trial Counsel would not have stipulated to the chain of custody and

---

Rule 61(i)(3) because a *Brady* violation undermines the fairness of the proceeding leading to the judgment of conviction. Because *Brady* violations strike at the core of a fair trial, the consequences of a failure to comply with *Brady* must be examined carefully."); *State v. Binaird*, 2016 WL 358990, *3 (Del. Super. Jan. 22, 2016) ("Because the credibility and bias of witnesses can be central to the State's case at trial, impeachment evidence also falls under the *Brady* umbrella if it is going to be used at trial.").

[14] *See Starling v. State*, 130 A.3d 316, 333 (Del. 2015), *reargument denied* (Jan. 14, 2016).

[15] On one occasion, Phillips misplaced a bag of drug evidence that she later recovered in her lab pocket.  On another occasion, Phillips violated DFS policy by taking a bag of evidence into the bathroom.

admission of the drug reports into evidence. Gibson further argues that, had the State been forced to present the drug report during its case-in-chief, Gibson could have impeached Phillips and affected the jury's judgment.

11. A *Brady* violation occurs when: "(1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant."[16] The prejudice requirement is satisfied if the defendant can demonstrate that the suppressed evidence "creates a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[17]

12. In *State v. Miller*, this Court held that non-disclosure of OMCE-related misconduct is not automatically a violation of *Brady*.[18] In *Miller*, the Court held that when the identity and weight of the drugs was undisputed and OCME lab reports were stipulated to and admitted into evidence, "the defendant has waived his or her right to test the chain of custody of that drug evidence."[19] When the testimony of OCME employees is not presented at trial, the assertion that defendants were "denied the opportunity to use the impeachment evidence on cross-examination holds little weight."[20] The *Miller* Court also emphasized the significant evidence of the defendants' guilt such that impeaching the OCME

---

[16] *State v. Miller*, 2017 WL 1969780, *5 (Del. Super. May 11, 2017) (internal citations omitted).
[17] *Id.* (internal citations omitted).
[18] *Id.* at *8.
[19] *Id.* at *7.
[20] *Id.*

8

employees would do little to undermine confidence in their guilty verdicts.[21] In *Miller*, OCME employee misconduct occurred after the defendants' trials, while it occurred contemporaneously with the testing in Gibson's case. Importantly, however, none of the alleged or proven misconduct involved falsifying evidence, a fact found significant by both this Court and the Delaware Supreme Court in resolving motions similar to Gibson's.[22] In short, the *Miller* Court concluded the nature of the suppressed evidence, the substantial evidence of guilt, and evidentiary stipulations were sufficient to deny a claim under *Brady*.

13. Here, the identity and weight of the controlled substances were stipulated to and admitted into evidence without objection. Gibson therefore waived his right to test the chain of custody at trial. Because Phillips did not testify at the trial, Gibson was not denied the opportunity to use impeachment evidence against her. More crucial, however, is the substantial evidence of Gibson's guilt. Even before the stipulation, Gibson confessed the drugs were his in a post-*Miranda* statement. Further, there is no evidence that Phillips' misconduct affected any of the evidence in this case, nor is there any suggestion that Phillips ever falsified evidence. Additionally, before Phillips ever handled the evidence, NMS Labs independently confirmed the weight of the drugs and the presence of

---

[21] *Id.* at *8.
[22] *Aricidiacono v. State*, 125 A.3d 677, 678 (Del. 2015); *Brown v. State*, 108 A.3d 1201, 1202-03 (Del. 2015).

marijuana and heroin. This evidence, combined with the pre-trial stipulation, leaves no room to undermine confidence in Gibson's conviction. Because Gibson has not shown he was prejudiced by the non-disclosure, he has not shown the existence of a *Brady* violation.

**C. Gibson has not shown Trial Counsel was ineffective.**

14. Gibson contends Trial Counsel was ineffective because he (i) failed to request a recess to review Gibson's October prison calls, and (ii) failed to object to the State's questioning during trial.

15. To prevail on a postconviction claim for ineffective assistance of counsel, the defendant must show: (i) "counsel's conduct fell measurably below the conduct expected of reasonably competent criminal defense counsel,"[23] and (ii) "that counsel's action was prejudicial in that, but for counsel's error, there is a reasonable probability that the result of the case would have been different."[24]

16. Gibson argues trial counsel had a duty to review Gibson's October prison calls once the State revealed it was in possession of the call records. Gibson contends the calls may have contained exculpatory evidence that would have enabled Trial Counsel to contradict the State's inferences and allowed the jury to fully evaluate Gibson's credibility.

---

[23] *Stevenson v. State*, 469 A.2d 797, 799 (Del. 1983) (internal citations omitted).
[24] *Robinson v. State*, 562 A.2d 1184, 1185 (Del. 1989).

17. Trial Counsel responds by affidavit that he made a strategic decision not to review Gibson's October prison phone calls because a lengthy review would have focused undue attention on one medium for Gibson's contact with the outside world. The affidavit explains that, even if Trial Counsel reviewed the October calls and heard no mention of Mr. Turner's death, the State could have questioned Gibson about other communication mediums, such as letters, prison visits, and jailhouse rumors. Trial Counsel decided an inability to review the alternative mediums would have highlighted those other mediums and had the effect of conceding Gibson's knowledge of Turner's death.

18. The State responds to Gibson's motion by arguing the only information proffered by the State during the relevant questioning was the number of calls Gibson made during the month of October. The State argues that a review of the content of those calls would not have changed the fact that Gibson made forty-five calls in one month, contrary to his testimony that he did not frequently use the phone. The State further argues that Gibson's credibility would suffer regardless of the contents of the calls. The State contends that if Gibson made no mention of Turner in forty-five calls during the month of October, the jury could infer Gibson was not as close to Turner as Gibson alleged. If the calls did mention Turner's death, it would have impeached Gibson's previous testimony. Either way, the State argues, his credibility negatively would have been affected.

11

19.     Gibson has not shown Trial Counsel's decision to not review the phone calls fell below the objective standard of reasonableness. There is a strong presumption that counsel's representation was reasonable.[25]     Trial Counsel's affidavit provides several reasons to support his strategic decision not to request a recess to review the calls' contents. Reviewing the calls would have drawn undue attention to the other means through which Gibson could have learned of Turner's death and would not change the number of calls Gibson made. Additionally, although a review of the calls may have rehabilitated Gibson's testimony in the sense that he made no mention of Turner, the argument that this minor point would bolster his credibility with the jury holds little weight.

20.     As to Trial Counsel's failure to object to the State's line of questioning during cross-examination, Gibson argues the failure allowed the State improperly to editorialize his testimony and convey the prosecutor's skepticism to the jury. On two occasions, the State commented that Gibson's responses were "interesting." The first exchange occurred when the State questioned Gibson about Turner's living situation during the arrest:

> THE STATE: . . . But when they [the police] asked who was there, nothing about Jason Turner, right?
> THE DEFENDANT: Sir, it's kind of like a serious thing growing up where we grew up to not really put nobody in a situation if you don't have to.  And at that time I was just trying to get my children and

---

[25] *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).

make sure Idamae was all right. So I was going to take full responsibility of what was going on in the situation.

THE STATE: That's an interesting thing you said. . . .[26]

21.     The second exchange occurred when the State asked whether Gibson remembered dropping a bag of heroin in the Mountaineer:

THE DEFENDANT: I never done anything of that sort, sir.
THE STATE: And 202 bags of heroin were found in the Taurus, right?
THE DEFENDANT: Yeah, allegedly so.
THE STATE: Allegedly so. Interesting. Okay.[27]

22.     When asking about the veracity of Gibson's testimony in relation to his post-*Miranda* statement:

THE STATE: And you are going to have us believe that you concocted a story to say that a significant amount of heroin was yours to protect Jason Turner?
THE DEFENDANT: I was protecting my family.
THE STATE: Help me understand how the two mesh. How can you be protecting your family by saying things that get you charged when you could have just said who you are telling us it belonged to?[28]

23.     Gibson argues the State's use of "interesting" and "you are going to have us believe" was editorializing, and Trial Counsel's failure to object amounted to ineffective assistance.

24.     "Under Delaware law, the jury is the sole trier of fact, responsible for determining witness credibility and resolving conflicts in the testimony."[29] Because

---

[26] *State v. Gibson*, ID No. 1311003232, at 57-58 (Del. Super. Jan. 14, 2015) (TRANSCRIPT).
[27] *Id.* at 61.
[28] *Id.* at 71-72.

13

of the confidence the average juror places in the prosecuting attorney, he or she should refrain from improper suggestions which may carry much weight against the accused.[30]

25.    Here, however, even if the Court assumes that Trial Counsel's decision not to object to the State's comments fell below the objective standard of reasonableness, Gibson has not shown that, but for counsel's error, there is a reasonable probability his trial would have produced a different result. Notwithstanding the average juror's confidence in a prosecuting attorney, the use of "interesting" and "you are going to have us believe" was not likely to undermine the conviction in this case. Gibson confessed that the gun and drugs belonged to him when he was arrested. He later recanted his confession and alleged Turner actually possessed the drugs and that Gibson lied to cover for Turner. The post-*Miranda* statement therefore gave the jury independent reason for doubting the veracity of Gibson's testimony notwithstanding the State's comments. There was no evidence, save Gibson's testimony, linking Turner to Gibson's residence or cars, let alone the drugs and the gun found there. Accordingly, Trial Counsel was not ineffective in failing to object to comments that would not have changed the result of trial.

---

[29] *Jones v. State*, 1996 WL 376937, *2 (Del. Super. June 28, 1996).
[30] *Berger v. U.S.*, 295 U.S. 78, 88 (1935).

14

For all the foregoing reasons, Laquan Gibson's Motion for Postconviction

Relief is **DENIED. IT IS SO ORDERED.**

Abigail M. LeGrow, Judge

Original to Prothonotary
cc:    James K. McCloskey, Deputy Attorney General
       Benjamin S. Gifford, Esquire

15