**IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY**

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | Case No. 1607003537 |
| | ) | |
| FELIX HUTCHINSON | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: January 25, 2019[1]
Decided: January 30, 2019

Anthony J. Hill, Esquire
Deputy Attorney General
820 N. French Street, 7th Floor
Wilmington, DE 19801
*Attorney for the State of Delaware*

Raj Srivatsan, Esquire
Assistant Public Defender
900 N. King Street, 2nd Floor
Wilmington, DE 19801
*Attorney for Defendant*

## MEMORANDUM OPINION AND ORDER
## ON DEFENDANT'S MOTION TO DISMISS

The defendant, Felix Hutchinson (hereinafter the "Defendant"), brings this Motion to Dismiss. Defendant stood trial on August 6, 2018, for offensive touching, allegedly committed against Patrick Harsha (hereinafter "Mr. Harsha"), a Wilmington Housing Authority security guard. Mid-trial, Defendant moved for dismissal based on the State's failure to obtain and provide to Defendant 911 recordings pertaining to this matter in violation of *Brady v. Maryland*.[2] The State opposes Defendant's Motion, alleging that the failure to turn over the 911 recordings does not amount to an unfair trial nor would it compromise the confidence in a guilty verdict should the Court so rule.

---

[1] On January 25, 2019, the Court received the 911 recordings for *in camera* review.
[2] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

During trial, Defendant also moved for a judgement of acquittal, which was denied by the Court. Defendant's Answer Brief pertaining to the instant Motion to Dismiss asserts renewal of Defendant's Motion of Acquittal, which the Court also denies.

On August 6, 2018, following the Motion to Dismiss, the Court ordered supplemental briefing on whether the 911 calls still existed, and, if so, whether the State's failure to provide Defendant with the recordings constituted a *Brady* violation. This is the Final Decision and Order of the Court on Defendant's Motion to Dismiss.

## FACTS AND PROCEDURAL HISTORY

On September 3, 2017, Defendant was charged with Offensive Touching, in violation of 11 *Del. C.* § 601(a)(1). The alleged offense took place June 30, 2016. On December 14, 2017, Defendant sent the State a discovery request, asking for "[c]opies of all audio or videotapes"[3] and "[a]ll information and materials in the possession of the State which fall within the ambit of *Brady*."[4] At trial on August 6, 2018, Defendant moved for dismissal of the case and judgment of acquittal during trial for the State's alleged failure to provide Defendant with 911 recordings pertaining to the case. Prior to Defendant's Motions, the State presented its case which consisted of testimony from Mr. Harsha and Senior Corporal Matthew Cavanaugh[5] (hereinafter "Cpl. Cavanaugh") of the Wilmington Police Department. Following Defendant's Motion, the defense presented the testimony of Defendant. Subsequent to trial, the State was able to obtain copies of the 911 recordings and supplied them to defense counsel. Upon review of the supplemental briefs

---

[3] Def.'s Ans. Br. at 5.
[4] *Id.*
[5] Cpl. Cavanaugh was the responding officer at the scene on June 30, 2016.

2

received by the parties, the Court issued an order compelling *in camera* review of the 911 recordings in question.

The 911 recordings consist of eight calls. The first call, from an unidentified female, reporting a black man yelling, cursing, and "screaming about Africa" in Madison Gardens Court Yard, was not referenced during trial. The second call, from Wilmington Housing Authority Security Officer, Patrick Harsha, reporting a drunk Jamaican man yelling and screaming in a parking lot and making threats towards the caller, was referenced by complainant, Patrick Harsha, at trial. Upon review of the second call, the subject can be heard yelling "black power" in the background seemingly getting closer to the caller as the call continues. The third call, again from Wilmington Housing Authority Security Officer, Patrick Harsha, reporting that the man was trying to storm the caller's vehicle, was referenced by complainant, Patrick Harsha, at trial. The fourth call, from an unidentified female, reporting a fight in front of her house located on Garden Court, was not referenced at trial. The caller reported the fight was between a Wilmington Housing Authority Security Officer and another man unknown to the caller. The caller further stated: 1) "I thought security would have been called, but I guess not;" 2) "He was trying to leave peacefully ... I do not know why the man kept badgering him;" 3) "I do not know why the security guard did not call 911 . . . I am not sure if he did or didn't . . . the cops are just not here;" 4) in response to a question by the dispatcher, the caller states, "I guess he is security . . . I have never seen him before . . . but his car says WHA . . . looks like he has on a badge and a white shirt . . . I think it is a white guy . . . and the other guy . . . a black guy . . . he looks drunk . . . I do not even know if he lives here." The fifth caller, from a guard at the Kennedy building, reporting that his rover was on Madison Street behind the McDonald's and needed help because he had been assaulted, was not referenced during trial. The dispatcher tells this caller that the security officer did not say he had

3

been assaulted when he called. The caller explained that the security officer had just called and stated he was assaulted. The sixth caller, again from the guard at the Kennedy building, reporting that the security guard was pinned down and the cops had not yet arrived, was not referenced during trial. The seventh call, from an unidentified female, reporting someone screaming or fighting outside, was not referenced at trial. The eighth call, again from the guard at the Kennedy building, reporting that he keeps trying to talk to his rover but he sounds out of breath, was not referenced at trial. The dispatcher advised the caller that police were on the scene.

## PARTIES' CONTENTIONS

Defendant argues that the State violated its "duty to disclose evidence that is favorable to . . . Defendant."[6] Defendant contends that under the materiality standard found in *United States v. Bagley*,[7] the State's suppression of the 911 recordings "undermines confidence in the outcome at trial."[8] Defendant asserts that the defense requested "all audio or videotapes"[9] and all materials falling "within the ambit of *Brady*"[10] which covered the 911 recordings in question. Defendant also highlights various newfound impeachment opportunities presented by the existence of the 911 recordings.

The State admits its failure to discover and provide the 911 recordings to Defendant, but argues that such failure does "not undermine the confidence in the outcome of Defendant's trial, nor would it implicate the fairness of the proceeding."[11] The State contends that the victim's testimony made no mention of a 911 call pertaining to the charge of offensive touching. Further,

---

[6] Def.'s Ans. Br. at 3.
[7] 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).
[8] *Id.* at 678.
[9] Def.'s Ans. Br. at 5.
[10] *Id.*
[11] State's Letter Br. at 2.

4

the State argues that the victim testified to only two 911 calls wherein the victim complains of a drunk and disorderly person and subsequently when Defendant allegedly began striking the victim's vehicle.

## DISCUSSION

It has been long established that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[12] As to materiality of the evidence,

> the defendant needs not show that the disclosure of the suppressed evidence would have resulted in an acquittal.[13] The defendant must show, however, that the suppressed evidence creates a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.[14] In other words, the suppression of evidence must undermine[] confidence in the outcome of the trial.[15]

Reasonable probability does not require the defendant to show by a preponderance that had the evidence been obtained, the defendant would have been acquitted. Additionally, materiality turns on the cumulative effect of all evidence withheld.[16] The Delaware Supreme Court in *Michael v. State* noted, "evidence which the defense can use to impeach a prosecution witness by showing

---

[12] *Brady*, 373 U.S. at 87.
[13] *Starling v. State*, 130 A.3d 316, 333 (Del. 2015) (quoting *Wright v. State*, 91 A.3d 972, 988 (Del. 2014)).
[14] *Id.*
[15] *Id.*
[16] *Kyles v. Whitley*, 514 U.S. 419, 420, 115 S. Ct. 1555, 1558, 131 L. Ed. 2d 490 (1995).

5

bias or interest, as well as exculpatory evidence, falls within the *Brady* rule."[17] "The reviewing court may also consider any adverse effect from nondisclosure on the preparation or presentation of the defendant's case."[18] Ultimately, Defendant must show that "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[19] The Supreme Court "will not reverse a conviction based on a *Brady* violation if there is 'overwhelming evidence establish[ing a defendant's] guilt.'"[20]

"[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense,"[21] but "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."[22] The State concedes that it failed to discover the 911 recordings in question as a result of the mistaken belief that the calls no longer existed given the gap in time between the incident and the arrest dates. While the Court appreciates the State's subsequent efforts to provide Defendant with the recordings requested upon Defendant's Motion, the Court cannot condone even the inadvertent withholding of evidence within the State's responsibility. Such deviations could, in some cases, result in due process violations. But such failure on the part of the State, alone, does not render the instant matter a *Brady* violation.

After *in camera* review of the 911 recordings, the Court does not find that the newfound evidence paints this case in such a different light so as to undermine confidence in a verdict of guilty, should the Court so rule. While it is true, as Defendant contends, that the Court can consider the impeachment value of the evidence in its evaluation of a *Brady* violation, the evidence must

---

[17] *Starling*, 130 A.3d at 334 (quoting *Michael v. State*, 529 A.2d 752, 756 (Del. 1987), *abrogated by Stevens v. State*, 129 A.3d 206 (Del. 2015)).
[18] *Starling*, 130 A.3d at 333.
[19] *Kyles*, 514 U.S. at 419.
[20] *Starling*, 130 A.3d at 333 (quoting *Jackson v. State*, 770 A.2d 506, 517 (Del. 2001)).
[21] *Kyles*, 514 U.S. at 436–37.
[22] *Id.* at 437.

undermine confidence in the outcome of trial. Defendant claims that the recordings would have enabled Defendant to "explore the veracity, accuracy, reliability and demeanor of Mr. Harsha's and Cpl. Cavanaugh's testimony."[23] In claiming such, Defendant asserts that "the content, tone, background noises, demeanor of the alleged victim, the calmness of his voice, [and] his reluctance to ask the 911 operator to call the police . . . [are] crucial and germane[] to a standard impeachment examination."[24] The issue with Defendant's assertion here, is that there were clear background noises, namely during Mr. Harsha's first 911 call. The subject of the call can be heard screaming, "black power" and seemingly gets closer to the caller as the call progresses. Additionally, in contrast with Defendant's contentions, it would be a mischaracterization to say that Mr. Harsha was "reluctant to ask the 911 operator to call the police."[25] Mr. Harsha explained to the 911 operator that he was working as security and he would be on site when the officers arrived. Defendant also alleges that it is material that Mr. Harsha's co-worker, the guard from the Kennedy building, provided the dispatcher with misinformation about Mr. Harsha being assaulted. It is clear from the sequence and content of the calls that Mr. Harsha's two calls preceded the full escalation of the incident. This conforms with the testimony presented at trial.

There are also obvious discrepancies between the calls reviewed *in camera* and Defendant's transcription of the calls.[26] Defendant places emphasis on the fact that there is no background noise in the second call,[27] the same call where "black power" can be clearly heard in the background. In regard to that same call, Defendant characterizes the description of the drunk man as "white" or "Eurasian."[28] During that 911 call, Mr. Harsha in fact describes the subject as

---

[23] Def.'s Ans. Br. at 6.
[24] *Id.*
[25] *Id.*
[26] This is not an exclusive list of the discrepancies between the 911 recordings and Defendant's transcription of the recordings.
[27] Def.'s Ans. Br. at 8.
[28] *Id.*

7

black, further explaining that he sounded Jamaican. There were also material mischaracterizations of the fourth call. In the fourth call the caller uses pronouns on a couple of occasions, but it is clear from the sequence of the caller's sentences and the consistent labeling of Mr. Harsha as the "security guard" and the subject of the call as the "man" that the caller was not conveying that Mr. Harsha was the offender as Defendant suggests.[29] There are also material omissions in Defendant's transcription of the fourth call. For example, Defendant transcribed, "I guess he is security. I have never seen him before. Looks like he has on a badge, white shirt. He looks drunk!"[30] Such implies the security guard was drunk when in fact the caller stated, "I guess he is security . . . I have never seen him before . . . but his car says WHA . . . looks like he has on a badge and a white shirt . . . I think it is a white guy . . . and the other guy . . . a black guy . . . he looks drunk . . . I do not even know if he lives here." Additionally, Defendant alleges that the State has had "two bites at the apple,"[31] because to date the State has not provided the two 911 calls referenced by Mr. Harsha during trial. Contrary to Defendant's assertion, the eight 911 recordings include the two calls from Mr. Harsha referenced during trial.

While receipt the 911 calls may have assisted Defendant in eliciting impeachment material, the Court finds upon review of the 911 records that any impeachment derived from the 911 recordings would have little value. In fact, the 911 calls were unfavorable to Defendant, and if submitted into evidence would have significantly supported the State's case and undermined Defendant's contention that he was not intoxicated on the night in question. Therefore, the Court finds there would be no diminished confidence in the outcome of this trial. The State correctly contends that the 911 recordings, "when coupled with the other testimony [the Court] has heard,

---

[29] *Id.* at 9.
[30] *Id.* at 10.
[31] Def.'s Rebuttal Email ¶ 14.

8

does not rise to the level of an unfair trial nor does it discredit a verdict of guilty should the Court [so] rule."[32]

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** this 30th day of January, 2019, that Defendant's Motion to Dismiss be **DENIED.**

_____
The Honorable Carl C. Danberg
Judge

---

[32] State's Letter Br. at 3. Let it be noted that the outcome here is fact specific to this case and the Court does not promote the prosecution to run afoul of *Brady*.