# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      )
                                      )
               Plaintiff,      )
                                        )      **Case No.:** 1611008842A/B
       v.                         )
                                        )
**KEVIN MILLER,**            )
               Defendant.      )

Submitted: November 14, 2025
Decided: December 8, 2025

## ORDER AND OPINION
*Upon Consideration of Defendant's*
*Motion for Postconviction Relief* - **DENIED**

*Elizabeth R. McFarlan, Deputy Attorney General*, Attorney General's Office, 820 N. French Street, 7th floor, Wilmington, Delaware, *Attorney for the State.*

*Christopher S. Koyste, Esquire*, Law Office of Christopher S. Koyste LLC, Wilmington, Delaware *Attorney for Defendant.*

**Jones, J.**

On April 22, 2022, Kevin "Chevy" Miller ("Miller") filed a *pro se* Motion for Postconviction Relief pursuant to Superior Court Criminal Rule 61 ("Rule 61 Motion") and a request for appointment of counsel.[1] The Court appointed counsel for the instant postconviction proceedings, and an Amended Opening Brief was filed on November 6, 2024.[2] Trial Counsel filed an Affidavit in Response to Miller's Motion on April 22, 2025.[3] A Supplemental Amended Motion was filed on August 6, 2025 adding an *Erlinger* claim.[4] The State filed its Response on September 2, 2025.[5] Defendant filed a Reply Brief on November 14, 2025.

## I.     BACKGROUND AND PROCEDURAL HISTORY

Miller's convictions, and the instant Postconviction Motion, stem from an incident which took place on July 17, 2012, in the neighborhood Brookmont Farms.[6] On the evening of this date, Jeremiah "Farmer" McDonald ("McDonald") was with two women in the Heron Street cul-de-sac when a person in a wolf mask approached him and shot him multiple times.[7] McDonald was pronounced dead at the scene, and the initial investigation was left as a cold case with no arrests.[8] However, in

---

[1] Docket Item ("D.I.") 166.
[2] D.I. 184.
[3] D.I. 202.
[4] *Erlinger v. United States*, 602 U.S. 821 (2024).
[5] D.I. 209.
[6] *Miller v. State*, 270 A.3d 259, 262 (Del. 2022).
[7] *Id.*
[8] *Id.*

2016, the New Castle County Cold Case Homicide Squad reopened the investigation which led to the arrest and indictment of Miller.[9]

On November 21, 2016, Miller was indicted on charges of Murder First Degree, Possession of a Firearm During the Commission of a Felony ("PFDCF"), and Possession of a Firearm By a Person Prohibited ("PFBPP").[10] The State reindicted Miller on April 23, 2018 and added the charge of Witness Tampering.[11] The Trial Court found Miller guilty of PFBPP at a severed bench trial, and a jury found Miller guilty of the other two charges.[12] Subsequently, the Trial Court declared Miller a habitual offender and sentenced him to a life sentence plus thirty-five (35) years.[13] The Delaware Supreme Court affirmed the Superior Court on Miller's timely appeal.[14]

Before the Court is Miller's Motion for Postconviction Relief which asserts multiple allegations of Trial Counsel's inefficiencies and a *Brady* violation by the State. The following facts are pertinent to these allegations.

A. Pre-Trial Investigation

---

[9] *Id.*
[10] D.I. 184 p.1.
[11] *Id.*
[12] *Id.* p.2.
[13] *Id.*
[14] *Id.* p.3.

3

On July 17, 2012, law enforcement responded to 911 calls from Warner "Gene" Wheeler ("Wheeler") and Shantell Newman reporting a shooting in Brookmont Farms.[15]  The victim, McDonald, was pronounced dead on scene.[16]

Ms. Newman and Marquita Brooks were standing with McDonald when he was shot.  Ms. Newman testified that she saw "an individual walking from by the lights, I just see a furry hoodie, a big jacket, and when the individual comes close – I mean, it's a mask, it's a shiny mask."[17]  Ms. Brooks testified that the shooter "came from behind," McDonald and was wearing a "big fleece coat that had fur on the head, it looked like a mask up under it."[18]  She specified the mask to look like an "animal mask."[19]  Ms. Brooks further stated that the shooter fled "between some [nearby] houses."[20]  Neither Ms. Newman nor Ms. Brooks could identify the individual.[21]

On July 20, 2012, law enforcement executed a search warrant at 6 Heron Court, also known as the "Trap House," where law enforcement found a mask and two jackets, one with a fur collar.[22]  Detective Shahan testified at trial that Mr. Wheeler, Ms. Newman, and Ms. Brooks confirmed the mask in the Trap House was not the one on the shooter.[23]

---

[15] D.I. 184 p.5.
[16] Id.
[17] Id. (quoting A261-262).
[18] Id. (quoting A254).
[19] Id.
[20] D.I. 184 (quoting A255).
[21] Id.
[22] Id. p.6.
[23] Id.

4

During his interview on October 31, 2012, Mr. Wheeler told law enforcement that he observed Miller wearing a wolf mask and walking towards Heron Court from Flamingo Drive on the night of the incident.[24] Mr. Wheeler further stated he then saw Miller walk down Heron Court's cul-de-sac, shoot McDonald, and then flee through a nearby opening between houses.[25]

The case became a cold case until 2016 when Detective Shahan and Sergeant David re-opened the investigation in which they interviewed several people and indicted Miller on charges related to McDonald's death.[26]

Law enforcement interviewed Wheeler again on January 22, 2016.[27] During this interview, Wheeler shed light on what was happening in Heron Court earlier in the day.[28] He stated "everybody was playing games with each other. They had a paintball gun, BB guns, and everybody was running around wearing masks shooting each other, playing."[29] He identified individuals he saw wearing masks earlier in the day as "Boo," "Bell," "D-Man," and "M-7/M7."[30] Additionally, Mr. Wheeler recounted the following events leading up to the shooting:

> Mr. Wheeler indicated that he left the "Trap House" in order to retrieve a beer from Tamika Gary's residence 44 Heron Court. (A114). As he crossed to the other side of Heron Court, Mr. Wheeler noticed that there was a jeep backed into a driveway a few houses down from the "Trap

---

[24] *Id.* (*See* A38-76).
[25] D.I. 184 p.6.
[26] *Id.*
[27] *Id.* (*See* A102-166).
[28] D.I. 184 p.6.
[29] *Id.* p.7. (quoting A110).
[30] D.I. 184 p.7 (quoting A149; 154-56).

House". (A116-18). Inside the jeep, Mr. Wheeler indicated that "Boo" and "Bell" were smoking weed and that "M-7/M7" could have also been inside the jeep. (A116-18; A145; A149).

After retrieving the beer, Mr. Wheeler claimed he returned to the front step of Ms. Gary's residence which is where he alleges that he saw Mr. Miller put on the wolf mask, walk down Heron Court, and then shoot Mr. McDonald.[31] (A118-22).

The same day, law enforcement interviewed Ms. Gary.[32] She ensured that Mr. Wheeler was inside her home, 44 Heron Court, at the time of the incident because of his probation-enforced curfew.[33] She further stated that Mr. Wheeler did not tell her anything he saw that night.[34]

Law enforcement interviewed Miktrell Spriggs, "Bell," on March 5, 2018.[35] Mr. Spriggs told law enforcement that he was in New Jersey at the time of the incident and not at the crime scene, as other individuals claimed.[36]

B. Witness Testimony at Trial

The State called multiple witnesses to testify to Miller's conduct before, during, and after the incident.[37]

---

[31] D.I. 184 p.7.
[32] *Id.* p.7-8. (*See* A167-193).
[33] D.I. 184 p.8; n.11.
[34] *Id.* p.8.
[35] *Id.* p.8. (*See* A905-925).
[36] *Id.*
[37] *See also, the Delaware Supreme Court* decision on Miller's direct appeal which summarized the trial testimony. *Miller* at 270 A.2d at 262-266.

6

Krystal Bivings, the mother of McDonald's daughter, testified that her relationship with Miller created animosity between Miller and McDonald.[38] She also testified that the morning after the incident, Miller called her to check on her and stated that he was in Newark at the time of the shooting.[39]

James Watson's 2013 and 2016 pretrial statements to law enforcement were entered into the record via Detective Shahan under 11 *Del. C.* § 3507.[40] At first, Mr. Watson refused to testify if people from Brookmont Farms were in the courtroom, likely due to witness intimidation concerns.[41] Additionally, Mr. Watson stated "[j]ust give me the capias, then, I'm not getting on that stand in front of those people."[42] Eventually, Mr. Watson agreed to take the stand but stated he did not recall the night of the incident nor making either statement.[43] The entire 2016 pretrial statement was played into the record.[44] Detective Shahan read parts of Mr. Watson's 2013 pretrial statement.[45] The significant portions read into the record include:

> (1) [J]ust before the murder, Mr. Watson was standing at the end of a driveway on Heron Court when he saw someone with a gray wolf mask on walk from the side of the house; (2) the individual in the mask then pointed a gun at him to which Mr. Watson responded "stop playin"

---

[38] *Id.* p.9.
[39] *Id.*
[40] D.I. 184 p.9 (*See* A282).
[41] *Id.*
[42] *Miller v. State*, 270 A.3d 259, 263-64 (Del. 2022).
[43] D.I. 184 p.9.
[44] *Id.*
[45] *Id.* p.10.

7

before running to the other side of the house; (3) the masked individual then walked up to Mr. McDonald and shot him.[46]

Mr. Watson's identification of Miller to law enforcement was also read into the record.

> **Q.** Detective asks, "When did you say somebody's name," what is Mr. Watson's answer?
> **A.** "Nah. After a while down the line, and me and my peoples were talkin', I'm like "yo, I'm like 'yo the first person that popped in my mind was such and such, I'm like…"
> **Q.** Detective Eckerd asks, 'Was who?" What is the answer?
> **A.** "Some dude named Chevy."
> **Q.** And when Detective Eckerd asks why, what does Mr. Watson say?
> **A.** "Because like I'm from Brookmont, you feel what I'm sayin'? So I've been out there my whole life so if you – if I grew up with you all my life if you walk up on me you don't got to say nothing' I know what you look like by, by the way you figures like I'm thinkin' like you know what I'm sayin' damn somebody this height, this description damn like. Some – one the thing – I'm like yo' I wanted to talk about my people, like yo' what I seen dude I wanted to say yo' stop playin' Chevy, but like uh, stuck you know what I'm sayin'. But I'm like damn I'm glad I didn't it 'cause it might not have been him, but that's the first logical think that popped in my mind, like yo' stop playin'. You know what I mean? Like I'm sure if I'm went up Brookmont and rob somebody, somebody would be like I know it was Bocker and you got say nothing'. Just by my frame, the way I walk, like you know what I'm sayin' like, but it might – that's just what I thought, you know what I mean?"[47]

The State additionally called Michael Mude who testified that a few days before the incident Miller asked Mr. Mude where he could find McDonald.[48]  Mr. Mude further stated that on the day of the incident he witnessed Miller on the phone asking

---

[46] *Id.* (citations omitted).
[47] *Id.* p.10 (quoting A286).
[48] *Id.*

about the whereabouts of an individual and then heading towards a neighborhood near Brookmont Farms.[49] Mr. Mude testified to several conversations with Miller indicating admissions, including: (1) Miller telling Mr. Mude he was not concerned about witnesses to the murder because "Motherf***ers that seen me do it know better than to say my name, and the people that know I did it ain't going to say s**t;"[50] (2) Miller informing Mr. Mude he was at McDonald's funeral "keeping up appearances, making it look good;"[51] and, finally, (3) Miller told Mr. Mude he could "end up just like [his] boy Farmer" when Miller saw Mr. Mude's memorial tattoo for McDonald.[52] Mr. Mude also testified that after Miller told him he was "starting to worry him," Miller subsequently responded with a threat: "I don't need to tell you, I know where your mom live."[53] During cross-examination of Mr. Mude, Trial Counsel had the opportunity to question Mr. Mude on his cooperation with the State.[54] Mr. Mude responded that he spoke to law enforcement in 2014 with the intent to get consideration for his criminal charges in Delaware, but he did not get any.[55]

---

[49] D.I. 184 p.11 (*See* A327) (Miller "read [a] text, picked up the phone, and he called and he said 'He's out there right now, where at?' Then he said, 'Just keep him right there.'" Miller told the individual on the phone to "[d]o whatever you got to do, talk to him, I'll be right there five minutes."

[50] A373.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] D.I. 184 p.12.

[55] *Id.*; A376.

Mr. Wheeler testified to what he told law enforcement in his 2016 pretrial statement concerning the night of the incident.[56] As to Miller's witness tampering, Mr. Wheeler explained that he gave false statements to Miller's attorney in January 2018 "to help [Miller] out" after Miller discovered Mr. Wheeler gave statements to the police.[57] Mr. Wheeler also stated that Miller asked him to talk to his attorney.[58] Further, Mr. Wheeler testified that him and Miller would talk on the phone "in code," then Mr. Wheeler would receive letters from Miller with instructions on what Miller wanted Mr. Wheeler to do.[59]

Finally, the State admitted Tony Pruitt's pretrial statement via forfeiture by wrongdoing.[60] In his statement, Mr. Pruitt told law enforcement that Miller told him to "tell [his] boy [Mr. McDonald] Halloween is coming early."[61] Additionally, following Mr. Pruitt being served with a subpoena in person at the Office of the Attorney General, Mr. Pruitt informed his probation officer, as well as Amy Miller, "that he was terrified, that he had been threatened, that he did not want to go to court."[62] After being told by his probation officer to still show, Mr. Pruitt did not appear pursuant to the subpoena.[63] Police discovered that Mr. Pruitt, from a phone

---

[56] A425-27.
[57] A453-54; 461; 463; 485.
[58] A456-57.
[59] A464; 466-69; 479.
[60] D.I. 184 p.13 (citing A409).
[61] *Id.* (citing A406).
[62] A388.
[63] A389.

collected pursuant to a valid search warrant, that he informed a family member via text that five people showed up to his place of work.[64] Furthermore, the phone also revealed a text between an individual and Detective Shahan, that "Mr. Pruitt himself had been threatened not to come to court, that they saw his picture that he was going to testify," as Mr. Pruitt's photo was displayed in the opening.[65]

Following Mr. Pruitt's failure to appear pursuant to the subpoena, Mr. Pruitt subsequently testified that his absence was due to the fear he had for his family's life.[66] As a result, Mr. Pruitt was in prison for his failure to appear.[67] The Court ultimately found that "the government has shown that defendant has some type of wrongdoing, witness intimidation, that the wrongdoing was intended to procure the declarant's unavailability, and that the wrongdoing did procure his unavailability."[68]

Trial Counsel first called two witnesses, Dashanna Jones and Rose Miller, to support Miller's alibi.[69] Ms. Jones, the mother of one of Miller's children, testified on cross that Miller told her he was "in Smyrna with my wife" for a reason outside of this case.[70] Trial Counsel sought this testimony to show Miller was not giving different alibis for the night of the incident.[71] Ms. Miller, Miller's wife, testified that

---

[64] *Id.*
[65] A390.
[66] A419
[67] *Id.*
[68] A569
[69] *Id.*
[70] A642-43.
[71] A640.

11

Miller was living in Frenchtown Woods, near Maryland's border, in 2012, and that she spoke to him the night of the murder.[72]  Ms. Miller testified that she spoke to Miller on his landline, but the State refuted this by playing a prison call in which Ms. Miller recalled talking to Miller that night on his cellphone.[73]

Trial Counsel also called Gregory Johnson, a former prison acquaintance of Miller and Mr. Wheeler.  Mr. Johnson testified to a phone call with Mr. Wheeler who indicated when he arrived at Heron Court after the murder Miller was not there.[74]  Finally, Trial Counsel admitted photos of the crime scene through William Browne, the private investigator.[75]  Mr. Browne also testified to the distance during Mr. Wheeler's alleged identification of Miller.[76]

C. Post-Trial Interview of Tamika Gary

In his investigative report, Mr. Browne describes his post-trial interview of Tamika Gary on April 9, 2020.[77]  Ms. Gary told Mr. Browne that Mr. Wheeler testified falsely against Miller "because he owed Miller $20,000 and he believed that Miller was having a relationship with her."[78]  Ms. Gary also apprised Mr. Browne of Mr. Wheeler's observations and whereabouts on the night of the incident:

> …on the night of the incident, she believed that Wheeler was home at 32 Teal Circle, between the hours of 10:00 pm and 11;00 [sic] pm

---

[72] D.I. 184 p.13.
[73] A741-42.
[74] D.I. 184 p.13.
[75] *Id.*
[76] *Id. See* A651-56
[77] A835-36.
[78] A835.

because he was on probation as a level 3 sex offender and he knew that his probation officer would routinely conduct home visits during those hours to insure [sic] compliance with his curfew. Ms. Gary said that Wheeler showed up at her house on the night of the murder just after 11:00 pm. He did not say that he witnessed anything. Ms. Gary confirmed that she could not say where Wheeler was prior to arriving at her home.

I asked Ms. Gary if she and Wheeler had any conversation about what he observed at any time. She said that after the police had been looking for him and questioned him, he assured her that he didn't see anything and he had been in his house at the time of the murder.[79]

## D. Postconviction Investigation

Postconviction Counsel hired another private investigator, Stephen Kempski.[80] Mr. Kempski took pictures of the crime scene during the day and night, measured the distance between Miller and Mr. Wheeler during the alleged identification, and interviewed witnesses, including Mr. Spriggs, Mr. Bradley, and Ms. Gary.[81] Each witness provided Mr. Kempski with information consistent with their prior statements to either law enforcement or Mr. Browne.[82]

Postconviction Counsel also retained Dr. Suzanne Mannes to testify to Mr. Wheeler's ability to identify Miller the night of the incident.[83] Dr. Mannes is of the opinion that, considering factors such as the lighting, distance, and the use of a mask, Mr. Wheeler "could not see, and thus could not identify the perpetrator's face."[84]

---

[79] *Id.*
[80] D.I. 184 p.15.
[81] A926-79.
[82] *Id.*
[83] A846-57.
[84] A851.

13

## II.  GROUNDS FOR RELIEF

Miller puts forth five (5) grounds for relief which the Court summarizes as follows:

1.  Trial Counsel was ineffective for failing to present impeachment evidence against Mr. Wheeler's identification of Miller.

2.  Trial Counsel was ineffective because he did not call an expert witness to refute Mr. Wheeler's identification of Miller.

3.  The State committed a *Brady* violation by failing to timely disclose evidence which was crucial to the defense's impeachment of Mr. Wheeler.

4.  Trial Counsel was ineffective for failing to object at trial to the reading of inadmissible hearsay evidence – Mr. Watson's 2013 pretrial statement.

5.  The above violations amount to cumulative error which resulted in a violation of Miller's rights and a deprivation of a fair trial.

## III.  PROCEDURAL BARS UNDER RULE 61(i)

Before the substantive arguments of a Rule 61 Motion can be addressed, the Court must first ensure the Motion passes all procedural bars.[85]  The Court does not need to consider the merits of claims that do not surpass all procedural bars.[86]

---

[85] *State v. Appiah*, 2023 WL 5608927 (Del. Super. Ct. Aug. 28, 2023) (citing *Younger v. State*, 580 A.2d 552, 554 (Del. 1990)).
[86] *Younger*, 580 A.2d at 552.

14

First, a Rule 61 Motion "may not be filed more than one year after the judgment of conviction is final."[87]  In the case that a defendant files a direct appeal, a final judgement of conviction occurs "when the Supreme Court issues a mandate or order finally determining the case on direct review."[88]  The period does not begin to run until the date that the court hearing direct appeal issues an order or mandate.[89]  The Delaware Supreme Court issued a decision from Miller's direct appeal on January 11, 2022.[90]  Miller's initial motion for postconviction relief was filed on April 22, 2022.[91]  Therefore, Miller's motion is timely and is not impacted by this procedural bar.

Second, a movant may not file a second or subsequent Rule 61 Motion.[92]  The instant motion for postconviction relief is Miller's first, therefore this procedural bar is inapplicable.[93]

Third, "any ground for relief not asserted in the proceedings leading to judgement of conviction" is procedurally barred unless the movant can show "cause for relief from procedural default" and "prejudice from violation of movant's rights."[94]  Generally, ineffective assistance of counsel claims are not procedurally barred under

---

[87] Super. Ct. Crim. R. 61(i)(1).
[88] *Id.* R. 61(m)(1)(ii).
[89] *State v. Allen*, 2024 WL 1654514, at *12 (Del. Apr. 15, 2024) (citing *Felton v. State*, 945 A.2d 594 (Del. 2008).
[90] *Miller v. State*, 270 A.3d 259 (Del. 2022).
[91] D.I. 166.
[92] Super. Ct. Crim. R. 61(i)(2).
[93] D.I. 166.
[94] Super. Ct. Crim.  R. 61(i)(3)(A)-(B).

this provision because these claims cannot be brought in proceedings leading to conviction under Court rules and precedent nor are they heard for the first time on direct appeal.[95] However, if petitioner cannot sufficiently show counsel's performance amounted to ineffective assistance of counsel, then there is no cause for relief from the procedural bar.[96] When that is the case, petitioner cannot surpass this procedural bar solely on the basis that these claims could not be brought in prior proceedings.[97]

On the other hand, a *Brady* violation accusing the prosecution of misconduct can be brought on direct appeal and in a defendant's conviction proceedings.[98] Thus, a failure to raise a *Brady* violation in prior proceedings is subject to the procedural bar absent a showing of cause and prejudice.[99] Miller did not raise the alleged *Brady* violation until the instant Postconviction Motion. Nonetheless, Miller asserts the claim is not procedurally barred because he can show cause for relief and prejudice from violation of his rights.[100] To show cause, Miller must present an "external impediment" which "prevented counsel from constructing or raising the claim."[101]

---

[95] *Green v. State*, 238 A.3d 160, 175 (Del. 2020); *State v. Bartell*, 2023 WL 7905368 (Del. Super Ct. Nov. 16, 2023); *see McGriff v. State*, 2024 WL 3770733, at *2 (Del. August 12, 2024) ("[t]he procedural bars of Rule 61 do not bar a timely claim of ineffective assistance of counsel.")

[96] *Shelton v. State*, 744 A.2d 465, 475 (Del. 2000).

[97] *Id.*

[98] McGriff, 2024 WL 3770733, at *2 (holding Defendant's *Brady* violation claim barred by Rule 61(i)(3) because Defendant failed to contest the matter during trial, bring up on direct appeal, and provide a basis for cause-and-prejudice from the procedural default.)

[99] *Id.*

[100] D.I. 184 p. 52-53.

[101] *Younger*, 580 A.2d at 556 (citing *Murray v. Carrier*, 477 U.S. 478, (1986) ("[W]e hold that counsel's failure to raise a *particular* claim on appeal is to be scrutinized under the cause and prejudice standard when that failure is

Miller argues Appellate Counsel could not raise the *Brady* violation on appeal because the State has yet to provide the defense with Mr. Bradley's custodial record containing "crucial impeachment information."[102]

Finally, "any ground for relief that was formerly adjudicated," including "proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding" is barred.[103] None of the claims in Miller's Motion have been formerly adjudicated, therefore, Miller surpasses this procedural bar.

Rule 61(i)(5) provides several exceptions to the procedural bars discussed above. It precludes these bars from applying to claims that the court lacked jurisdiction over and to subsequent postconviction motions made that meet one of the following requirements: either (1) the motion "pleads with particularity" that new evidence has come to light creating a "strong inference the movant is actually innocent," or (2) the motion "pleads with particularity" that a constitutional law reviewed retroactively by the Delaware Supreme Court or the Supreme Court of the United States invalidates movant's conviction.[104] These exceptions do not apply to

---

treated as a procedural default by the state courts…cause for a procedural default on appeal ordinarily requires a showing of some extern impediment preventing counsel from constructing or raising the claim.").
[102] D.I. 184 p.52.
[103] Id. R. 61(i)(4). *Compare State v. Allen*, 2024 WL 1654514 (Del. Super. Ct. Apr. 15. 2024) (holding Rule 61(i)(4) inapplicable to their *Brady* violation claim raised on appeal because the Delaware Supreme Court found the claim to be speculative and did not "address the underlying merits," leading the Court to not fully adjudicate the claim), *with Appiah*, 2023 WL 5608927, at *15-16 (holding Defendant's *Brady* violation claim is procedurally barred by Rule 61(i)(4) because this claim was brought up at trial and was the basis for Trial Counsel's motion for a mistrial denied by the Court; therefore, the claim was fully adjudicated at proceedings leading to Defendant's conviction.)
[104] Super. Ct. Crim. R. 61(d)(2)(i)-(ii).

Defendants postconviction motion because he does not argue lack of jurisdictional claims nor is it a subsequent motion.

## IV.  INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

In *Strickland v. Washington*, the United States Supreme Court established the standard for an ineffective assistance of counsel claim for a criminal defendant.[105] The standard is a two-prong test requiring both prongs be met before a judgment is set aside.[106]  The *Strickland* Court emphasizes the importance of reviewing the court's responsibility to make an ineffective assistance determination without "the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[107]

The first prong, or the performance prong, asks whether counsel's representation was deficient in failing to meet an objective standard of reasonableness.[108]  This is a stringent burden for the movant to overcome because there is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."[109] The objective standard utilized in this prong considers "prevailing professional norms" in determining the reasonableness of counsel's actions.[110]

---

[105] 466 U.S. 668, 687 (1984).
[106] *Id.* at 689.
[107] *Id.*
[108] *Id.*
[109] *Id.* at 689.
[110] *Neal v. State*, 80 A.3d 935, 941 (citing *Strickland*, 466 U.S. at 689).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Therefore, "in any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[111]

If the performance prong is met, we move onto the second prong, or the prejudice prong, to determine whether deficiencies in counsel's representation caused the defendant substantial prejudice.[112] Under this prong, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[113] The potential of a different outcome "must be substantial, not just conceivable."[114] A reasonable probability is a probability "sufficient to undermine confidence in the outcome" of the proceeding.[115]

Claim I: Trial Counsel's Failure to Investigate and Present Impeaching Evidence of Mr. Wheeler

Miller argues Trial Counsel had the ability, yet neglected to, thoroughly investigate and pursue evidence to impeach the State's key witness in identifying Miller – Mr. Warner "Gene" Wheeler ("Wheeler").[116] Specifically, Miller asserts

---

[111] *Strickland*, 466 U.S. at 691.
[112] *Id.* at 687.
[113] *Id.* at 694.
[114] *Neal*, 80 A.3d at 942 (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).
[115] *Id.*
[116] D.I. 184 p. 21.

four potential witnesses whose testimony could have impeached Wheeler's testimony.[117]

In Wheeler's 2016 pretrial statement to law enforcement, he stated that he saw "Boo," "Bell," "D-Man," and "M-7/M7" wearing masks while "running around" and "playing games" on the day of the incident.[118] Wheeler also indicated that he saw Boo, Bell, and possibly M7 sitting in a driveway two doors down from the Trap House in a Jeep as Miller was headed in his wolf mask to shoot McDonald.[119]

Postconviction Counsel retained a private investigator, Mr. Stephen Kempski ("Kempski"), who investigated into the identities of Boo, Bell, and M7.[120] Kempski identified Bell as Miktrell Spriggs ("Spriggs").[121] Spriggs confirmed with Kempski that he was living in New Jersey at the time of the incident – what he repeatedly told police in his 2018 pretrial statement.[122] Kempski also pinned down D-Man as Demarius Bradley ("Bradley") and established that Bradley was incarcerated at the Ferris School at the time of the incident.[123] M7, identified as Mercedes Taylor ("Taylor"), stated to law enforcement in his 2013 pretrial statement that he was

---

[117] *Id*. p. 21-30.
[118] D.I. 184 A154-155.
[119] *Id.* A148-49.
[120] *Id.* p. 22-23.
[121] *Id.* p. 23 A928.
[122] *Id.* A905-07, 911-12, 915.
[123] *Id.* p.23 A 928-29.

inside the Trap House during the incident and not sitting in the Jeep with Boo and Bell as Wheeler suggested.[124]

Tamika Gary ("Gary") provided conflicting testimony between her 2016 pretrial statement to law enforcement and her posttrial interview with Browne. In her 2016 statement, Gary told law enforcement that Wheeler was inside her home at the time of the incident.[125] However, in Browne's report of his interview with Gary, he represents that Gary told him that Wheeler's trial testimony was "malicious," that Wheeler believed Miller and Gary were in a relationship and was jealous, and that Wheeler owed Miller $20,000.[126] Gary further told Browne that she believed, on the night of the incident, Wheeler was in his house between 10pm and 11pm because he had a curfew check for probation and that he arrived to Gary's residence at 11pm.[127] Gary gave a similar statement to Kempski during her postconviction investigation interview.[128]

Miller contends the above witnesses should have been investigated further, interviewed, and called as defense witnesses to impeach Wheeler's credibility.[129] By failing to do so, Miller argues that Trial Counsel acted ineffectively and

---

[124] *Id*. p. 24 A82, 85, 93.
[125] D.I. 184 A170, 173, 186.
[126] *Id.* A835.
[127] *Id.*
[128] *Id.* A946, 952-55.
[129] *Id.* p.24, 29.

prejudiced Miller's chance at a fair trial because Wheeler was the State's key identification witness.[130]

Trial Counsel ensures he conducted a full investigation, interviewed potential witness, and inspected the crime scene.[131] Following this review, trial counsel formed a defense strategy. Trial counsel noted that the individuals who spoke with his investigator offered nothing favorable to the defense and they did not want to get involved. He admits Wheeler's eyewitness testimony is prominent, but the State had more helpful evidence to its case, including Watson's pretrial testimony, Miller's confession to Mude, Pruitt's testimony, and Miller's witness intimidation charges.[132] Trial Counsel did not find witness statements given six years after the incident reliable nor did he believe testimony undercutting who Wheeler claimed he "saw or drank with prior to the shooting" impacts his credibility.[133] Further, Trial Counsel asserts that he made a strategic choice to not call Gary as a witness as "her testimony would possibly do more harm to the defense."[134] This is because her changed testimony made her an unreliable and non-credible witness, and the statements given to the investigators were unsupported opinions.[135]

---

[130] *Id.* p.30-33.
[131] D.I. 202 p.1-2.
[132] *Id.* p.2.
[133] *Id.*
[134] *Id.* p. 4-5.
[135] *Id.*

Trial Counsel also points out that Mr. Wheeler stated that Bradley was "playing games" in the area at the time of the murder. Defendant does not demonstrate with certainty that Mr. Bradley is the same person. Additionally, it does not appear that Mr. Bradley was interested in providing any additional help to the defense. Other than stating that he was 17 years old at the time of the shooting and that he was in the Ferris Detention Center, Mr. Bradley "declined to answer any further questions about the matter."

It also does not appear that Mr. Spriggs would have been helpful to the defense as his account of the events have been vague and contradictory. In an interview with a detective, Mr. Spriggs stated that he was definitely in New Jersey at the time of the murder. When the detective asked Mr. Spriggs how he knew he was in New Jersey at the time, Mr. Spriggs no longer appeared to be as certain and responded: "I can't tell you like exactly I know, but I just know." When asked when he came back from New Jersey, Mr. Spriggs answered: "I'm not even sure. I was like back and forth." He could not recall who told him about the murder. The detective also pointed out to Mr. Spriggs that multiple people stated that he was present in the area when the murder occurred. Likewise Mr. Spriggs informed Investigator Kempski that "other individuals had said that he was in the area of the shooting at the time, but refuted those claims…" Mr. Spriggs' account is vague and contradictory and that other

witnesses could have refuted it severely undermines Defendant's argument that Trial Counsel was ineffective for failing to call him as a witness.

Defendant's arguments that these two individuals could have meaningfully impeached Mr. Wheeler are based upon layers of speculation. And this is not enough to overcome the presumption that Trial Counsel's conduct was professionally reasonable, nor does Defendant's speculation, in any way, meet the high burden required to assert a valid ineffective assistance of counsel claim.

Miller relies on *Starling v. State* to support his argument. In *Starling*, the Delaware Supreme Court held that the trial counsel acted ineffectively by failing to cross-examine the State's sole eyewitness concerning a prior photograph identification of the defendant in which the eyewitness stated that the man in the picture – the defendant – was not the shooter  The court reasoned "where eyewitness testimony played a central role in the State's case, and no physical evidence linked [defendant] to the crime, Trial Counsel's failure to use important exculpatory evidence fell below any objective standard of reasonableness and was ineffective representation."

The instant case differs in two ways from *Starling*.  First, the evidence Miller alleges Trial Counsel is ineffective for not raising, goes to the credibility of Wheeler's memory on the day of the incident and not to exculpatory evidence. Second, Trial Counsel in this case made a strategic decision to not call the above-

mentioned witnesses for reasons pertaining to reliability and memory. Trial Counsel's strategic decision made after a thorough investigation of law and facts is "virtually unchallengeable."[136] Strategic choices made after a "less than complete" investigation, are reasonable "to the extent that reasonable professional judgments support the limitations on investigation."[137] Trial counsel in *Starling* simply forgot to cross examine the eyewitness on the issue.[138]

In contrast to *Starling* where trial counsel merely forgot to cross examine the eyewitness at issue, Trial Counsel's decision here to not call Ms. Gary as a witness was a strategic and tactical one based on Ms. Gary's previous inconsistent statements. Indeed, Ms. Gary's statement to Investigator Kempski that Mr. Wheeler was not at her home during the murder would likely not have been helpful to Defendant because it is inconsistent with her pretrial statement to police that Mr. Wheeler "was inside of her residence at the time of the murder and that 'he might been upstairs in the bedroom or something…'"[139] But she changed her account during Investigator Kempski's interview by stating that Mr. Wheeler was not at the house. Moreover, there is no indication that Trial Counsel was aware of this version of her story, and it should be "viewed with suspicion…" as it is inconsistent with

---

[136] *Strickland*, 466 U.S. at 690-91.
[137] *Id.*
[138] *Starling*, 130 A.3d at 324, 326.
[139] Rule 61 Motion at 27.

what she told the police.[140] "Review of counsel's representation is subject to a strong presumption that the representation was professionally reasonable."[141] Following that rule, it is the Court's opinion that Trial Counsel's reasonable tactical decision should not be second-guessed given the prior inconsistency of Ms. Gary's statements.

C. Claim II: Trial Counsel's Failure to Call an Identification Expert to Undermine Mr. Wheeler's Identification of Miller

Next, Miller claims Trial Counsel was ineffective for failing to call an identification expert witness to discount Wheeler's identification.[142] Miller bases this argument on the findings of Postconviction Counsel's retained expert, Dr. Mannes. Dr. Mannes produced a report which considered multiple factors in reaching her conclusion that "[Mr. Wheeler] could not see, and thus could not identify the perpetrator's face."[143] The factors Dr. Mannes evaluated include (1) the 200-foot distance between Wheeler and Miller; (2) the short period of time Miller's face was visible before putting on the mask; and (3) the time of day and poor lighting from where Wheeler could see.[144] Miller maintains there is reasonable doubt that the State would have met its burden if Trial Counsel presented an identification expert at trial because Wheeler was the State's sole eyewitness.[145]

---

[140] *See Blankenship*, 447 A.2d at 433.
[141] *Flamer v. State*, 585 A.2d 736, 753 (Del. 1995).
[142] D.I. 184 p.35.
[143] *Id.* p.37 A851.
[144] *Id.* A849-50.
[145] D.I. 184 p.40.

Trial Counsel denies this claim.[146]  Trial Counsel asserts he found no value in calling an expert witness because he crossed Wheeler on issues similar to that relied upon by Postconviction Counsel's expert – including lighting, distance, and potential obstructions.[147]  Further, Trial Counsel contends because the incident took place four years before Miller's arrest, the testimony as to the physical surroundings at the time of trial changed.[148]

Trial Counsel did attempt to undermine Mr. Wheeler as an eyewitness. In his affidavit, Trial Counsel writes that "Wheeler's identification was based upon his personal knowledge of [Defendant]" and that Trial Counsel "attacked Wheeler on bias, conditions of the lighting and distance from the crime" and that he "saw no value in calling an expert."[149]  Trial Counsel also entered photos taken of the crime scene area and from Google maps showing visual obstructions, and at closing he attacked Mr. Wheeler's eyewitness account by, again, pointing out that the crime occurred at night; that Mr. Wheeler was almost 200 feet away from the crime; and that, shortly after the crime, it was so dark in the area that the police needed to use lights to collect evidence.[150] An expert is not needed to explain the obvious to the jury that "it is difficult to see in the dark and at distances."[151]  As "Trial Counsel

---

[146] D.I. 202 p.6.
[147] *Id.; see* A424-27, 501-02, 520, 563,
[148] D.I. 202 p.7.
[149] Tr. Counsel Affidavit at 6. *See also, A490-502, A508-57.*
[150] A775-76, A779.
[151] D.I. 209 p.21.

succinctly put it, '[t]he argument that it was dark, the only witness was far from the scene, was apparent without an expert.'"[152] This Court finds that it was not ineffective assistance of Trial Counsel to not call an expert to merely state the obvious, that it is more challenging to see at night from a distance.

D. Claim IV: Trial Counsel's Failure to Object to Inadmissible, Speculative Hearsay from Mr. Watson's 2013 Pretrial Statement

Next, Miller claims Trial Counsel was objectively unreasonable in allowing Detective Shahan to read into the record Watson's 2013 pretrial statement because it is speculative hearsay under Delaware Rules of Evidence ("DRE") 602 and 801(d)(1).[153]

Due to Watson's limited testimony[154], the State sought to admit Watson's pretrial statements via 11 *Del. C.* §3507 which allows a "voluntary out-of-court statement of a witness who is present and subject to cross-examination" to be used "as affirmative evidence with substantive independent testimonial value."[155] Watson was deemed a recalcitrant witness as he would only agree to testify if there was no one from Brookmont Farms in the gallery.[156] Upon party agreement, the State played Watson's 2016 pretrial statement and read into the record portions of his 2013 pretrial statement,[157] including the following identification:

---

[152] *Id.* p.22 (citing D.I. 202 p.8).
[153] D.I. 184 p.55.
[154] Watson stated he had no memory of the night of the incident nor his 2013 pretrial statement. A279-80, 283.
[155] 11 *Del. C.* § 3507; *see* D.I. 184 A279.
[156] D.I. 209 p.5.
[157] A280, 283, 285-86.

28

**Q.** Detective asks, "When did you say somebody's name," what is Mr. Watson's answer?

**A.** "Nah. After a while down the line, and me and my peoples were talkin', I'm like 'yo, I'm 'yo the first person that popped in my mind was such and such, I'm like…"

**Q.** Detective Eckerd asks, "Was who?" What is the answer?

**A.** "Some dude named Chevy."

**Q.** And when Detective Eckerd asks why, what does Mr. Watson say?

**A.** "Because like I'm from Brookmont, you feel what I'm sayin'? So I've been out there my whole life so if you – if I grow up with you all my life if you walk up on me you don't got to say nothin' I know what you look like by, by the way you figures like I'm thinkin', like you know what I'm sayin' damn somebody this height, this description damn like. Some – one the thing – I'm like yo' I wanted to talk about my people, like yo' what I seen dude I wanted to say yo' stop playin' Chevy, but like uh, stuck you know what I'm sayin'. But I'm like damn I'm glad I didn't say it 'cause it might not have been him, but that's the first logical thing that popped in my mind, like yo' stop playin'. You know what I mean? Like I'm sure if I'm went up Brookmont and rob somebody, somebody would be like I know it was Bocker and you got say nothin'. Just by my frame, the way I walk, like you know what I'm sayin' like, but it might – that's just what I thought, you know what I mean?"[158]

Miller first argues the above statement contains double hearsay which is inadmissible unless each layer of hearsay "qualif[ies] independently as an exception to the hearsay rule."[159]

Miller acknowledges 11 *Del. C.* §3507 is an exception to hearsay but offers that it "does not permit a court to admit otherwise-inadmissible embedded hearsay within the §3507 statement."[160] Miller argues Watson's statement "after a while down the

---

[158] A286.

[159] *Demby v. States*, 695 A.2d 1152, 1162 (Del. 1997).

[160] D.I. 184 p.58 (citing *Downs v. State*, 2019 WL 1040407, at *4 (Del. 2019)).

line, and me and my peoples were talkin'" suggests that Watson's identification of Miller "was directly derived from the out-of-court statements made to Mr. Watson by his 'peoples' as is evident by Mr. Watson's own concession that 'it might not have been [Mr. Miller]."[161] This statement is not hearsay. Watson's testimony does not suggest to the Court that he did not identify Miller as the shooter until *after* he talked to his people or based upon what his people told him. In fact, his statement is clear in that he told his people the first person he thought of was "Chevy" – a.k.a. Miller.

Watson's statement was, "[a]fter a while down the line, me and my peoples were talkin', I'm like 'yo, I'm like 'yo the first person that popped into my mind was" Defendant.[162] The State sets forth:

> In no way does this statement contain out-of-court-statements made by Mr. Watson's "peoples." Mr. Watson merely states that he was talking to his "people" at some point without providing any hearsay statements. Mr. Watson states that "the first person that popped" into his mind when he was identifying the person in the mask was Defendant, indicating that he made the identification on his own and without the need for statements made by others.[163]

There is no indication that another party made an out-of-court statement that led Mr. Watson to believe it was Defendant wearing the mask. Consequently, it shows

---

[161] D.I. 184 p.58 (citing A286).
[162] D.I. 209 p.24.
[163] *Id.* p.24-25.

that the statement from Watson's 2013 pre-trial statement was not formulated because of talking with his "people." In short, the statement is not hearsay.

Objecting to this statement would not have changed the outcome because Watson's identification still properly came out through his trial testimony.

Next, Miller argues that Trial Counsel should have objected to Watson's statement under DRE 602.[164] DRE 602 states that "a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."[165] Miller contends Watson did not have personal knowledge that the individual he saw was Miller because Watson did not see the individual without the werewolf mask on.[166]

It is evident from Watson's testimony that he observed the masked individual to be Miller based on his longstanding personal knowledge of his figure and stature. As stated above, Watson's testimony reflects that he believed the individual was Miller before talking to other people and not after. Additionally, Miller asserts Watson's testimony "cause it might not have been him" discredits Watson's identification. The Court disagrees and finds the proceeding statement, "but that's the first logical thing that popped in my mind, like yo' stop playin"[167] as well as the rest of Watson's testimony to support his identification of Miller. As a result, the

---

[164] D.I. 184 p. 60.
[165] DEL. R. EVID. 602.
[166] D.I. 184 p.61.
[167] *Id.* p.10 (quoting A286)

31

Court finds that Watson had sufficient personal knowledge of the matter for his testimony to be permissible pursuant to DRE 602.[168]

## V. ***BRADY* VIOLATION**

A *Brady* violation occurs when the prosecution violates the defendant's due process rights by suppressing favorable evidence that is "material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."[169] The prosecution has duty to investigate and turn over favorable evidence that is "known to the others acting on the government's behalf in the case, including the police."[170] However, *Brady* does not impose a duty on the prosecution to "ferret out any potential defense-favorable information from materials that are so disclosed," nor "furnish a defendant with information which [s]he already has or, with reasonable diligence, she can obtain for [her]self."[171]

The three components of a *Brady* violation include: (1) the existence of exculpatory or impeaching evidence that is favorable to the accused; (2) suppression of that evidence by the State; and (3) the suppression prejudices the defendant.[172] Prejudice in this respect means there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

---

[168] DEL. R. EVID. 602.
[169] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).
[170] *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).
[171] *State v. McGuiness*, 2022 WL 1580601, at *4 (quoting *Wright v. State*, 91 A.3d 972, 987 (Del. 2014)).
[172] *Wright v. State*, 91 A.3d 972, 988 (Del. 2014).

different,"[173] and this reasonable probability "undermines confidence in the outcome of the trial."[174] The defendant must show that the evidence suppressed "creates a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[175] A conviction will not be reversed based on a *Brady* violation if there is "overwhelming evidence establish[ing a defendant's] guilt."[176] A new trial is only required if the Court finds that "undisclosed *Brady* information materially affected Defendant's right to a fair trial."[177]

A defendant must be procedurally able to bring his *Brady* claim, meaning there are no procedural bars preventing him from doing so. As asserted by the State, Delaware Superior Court Criminal 61(i)(3) places sufficient bars on this claim as the *Brady* allegation should have been raised on appeal. In addition to, and in analysis of Miller's *Brady* claim, the Court does not find such a violation.

Miller's Claim III asserts the State failed to disclose evidence critical to impeach their key eyewitness – Wheeler.[178] The evidence at issue is the impeachment evidence concerning "D-Man" – or Demarius Bradley's – custodial status on the day of the incident.[179] Miller asserts this evidence would bring to light the "clear factual

---

[173] *Starling v. State*, 130 A.3d 316, 333 (Del. 2015) (quoting *Jackson v. State*, 770 A.2d 506, 517 (Del. 2001)).
[174] *Kyles v. Whitley*, 514 U.S. 419 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).
[175] *Starling*, 130 A.3d at 333.
[176] *Id.* (quoting *Jackson v. State*, 770 A.2d 506, 517 (Del. 2001)).
[177] *State v. Andrus*, 2010 WL 2878871, at *8 (Del. Super. July 22, 2010).
[178] D.I. 184 p.45.
[179] *Id.*

inaccuracies" in Wheeler's testimony which stated that Bradley was "playing games" in Brookmont Farms on the day of the incident when he was actually incarcerated at the Ferris School.[180] Miller contends the operator of the Ferris School, Delaware's Division of Youth Rehabilitative Services, should be considered a part of the "prosecution team" because the Delaware Attorney General's Office exercises control over that Division as well as its parent division, Department of Services for Children, Youth, and their Families.

Trial Counsel "would agree that a Brady violation warrants a New Trial, if in fact the issue of who Wheeler was with prior to the shooting was relevant."[181] However, Trial Counsel contends the violation is not crucial to the defense because, like the other individuals' testimony Miller claims were key impeachment evidence, the interviews were conducted years after the incident.[182] Further, Trial Counsel maintains that proving Wheeler misidentified who was in the Trap House or the Jeep at the time of the incident would not overcome material evidence at trial.[183]

There was an overwhelming amount of evidence against Miller which would not constitute grounds for reversal of a conviction, even if there were a violation of *Brady*, given the magnitude of overwhelming evidence establishing Miller's guilt.[184]

---

[180] *Id.* p.46.
[181] D.I. 202 p.8.
[182] *Id.* p.10.
[183] *Id.* p.10-11.
[184] *Starling v. State*, 130 A.3d 316, 333 (Del. 2015) (quoting *Jackson v. State*, 770 A.2d 506, 517 (Del. 2001)).

Mr. Watson was able to identify Miller as the shooter despite not seeing his face, as Mr. Watson recognized Miller since they grew up together in Brookmont.[185] Mr. Mude testified that prior to the incident, Miller asked him were McDonald lived.[186] The day after McDonald's murder, "Miller admitted to the shooting stating, '[n]ah. Mother f*ckers that seen me do it know better than to say my name, and the people that know I did it ain't going to say sh*t.'"[187] Mr. Mude was also threatened by Miller with statements such as "I don't need to tell you, I know where your mom live" and "listen mother f*cker, you can end up just like your boy Farmer."[188] Mr. Wheeler identified Miller as in the testimony as the shooter, and Mr. Wheeler also received threatening phone calls to not testify, specifically "karma may miss you but it will hit your kids."[189] Finally, Pruitt was told by Miller to "tell McDonald that 'Halloween is coming early.'"[190]

To support his argument, Miller cites to numerous Circuit Court cases, including *United States v. Pelullo*.[191] In *Pelullo*, the Court acknowledged the general principle that "the prosecution is only obligated to disclose information known to others acting on the government's behalf in a particular case."[192] In applying this principle, the

---

[185] *Miller v. State*, 270 A.3d 259, 264 (Del. 2022).
[186] *Id.*
[187] *Id.*
[188] *Id.* at 265.
[189] *Id.*
[190] *Id.*
[191] 399 F.3d 197 (3d. Cir. 2005).
[192] *Id.* at 218 (citing *United States v. Merlino*, 349 F.3d 144 (3d. Cir. 2003); *United States v. Locascio*, 6 F.3d 924 (2d. Cir. 1993)).

Court held a government agency which was not in a "joint investigation" nor "otherwise shared labor or resources" with the prosecution was not a part of the "prosecution team."[193] *Pelullo* does not suggest, as Miller argues, that because agencies are under the umbrella of the same governmental department the agency members, whom the prosecution exerts no control over, are part of the "prosecution team" for *Brady* purposes.[194] The prosecution does not have a duty "to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue."[195] Thus, the Division of Youth Rehabilitative Services, which had no role in this case, is not in the "prosecution team" merely because it falls under the Delaware Attorney General's Office. While Departments and Divisions of the Attorney General's Office very well may share labor and resources, the proper inquiry is whether there were shared labor and resources pertaining to the investigation at hand.[196]

Additionally, Miller cites to *Atkinson v. State* to support his argument. *Atkinson*, Defendant stood trial for and was convicted of Attempted Unlawful Sexual Intercourse in the Second Degree.[197] On appeal, the *Brady* issue involves the

---

[193] *Pelullo*, 399 F.3d at 218.
[194] *Id.* (holding prosecution did not have control over agency officials in the Department of Labor ("DOL") nor was the entire DOL considered part of the "prosecution team" despite some DOL agents partaking in the investigation.)
[195] *Id.* (quoting *Merlino*, 349 F.3d at 154).
[196] *Pelullo*, 399 F.3d at 218 (citing *United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979) (holding state investigation information was imputed to federal prosecutors because "the two governments, state and federal, pooled their investigative energies [to prosecute the defendants]").
[197] *Atkinson v. State*, 778 A.2d 1058, 1060 (Del. 2001).

36

prosecution not turning over notes taken by Deputy Attorney General Daniel Miller during witness interviews with police.[198] These notes suggested that there was no sexual component mentioned by the Victim and the Court found this to be "favorable evidence that would be material to impeachment of one or more key witnesses."[199] This finding concluded a "reasonable probability of a different result had the favorable evidence the State withheld been provided in a timely fashion." [200] The Court in *Atkinson* found the withheld evidence to be "both favorable to Atkinson and material in that it may have affected the outcome of the trial," which warranted a new trial.[201]

In the instant case, the alleged *Brady* violation by Miller covers the custodial status of Demarius Bradley on the date of the incident. The evidence surrounding the custodial status of a person not directly involved does not go towards the grounds that would fall within the *Brady* rule and warrant reversal, as Miller states that *Atkinson* requires.

Trial Counsel, in its sworn affidavit, swears to the following:

> If defense elected to go in that direction, that is, Wheeler was lying about who he witnessed shooting Farmer , because he mis identified [sic] who was in trap house or in the Jeep, the fact that Bradley ( if in fact it was him ) was in custody would have enabled defense to argue that Wheeler was wrong. This however would only apply

---

[198] *Id.* at 1061.
[199]  *Id.* at 1064.
[200]  *Id.*
[201] *Id.*

if in fact Wheeler was correct in who he saw in the trap house or in the area. **It also would not aide in the attack on Mude and Pruit**, as well as Wheeler on the issue of witness intimidation.[202]

Trial Counsel also notes in its affidavit that this would only be applicable if who Wheeler was with prior to the shooting was relevant.[203] Wheeler also "in any of his statements never claimed that he was with anyone at the time he witnessed the shooting."[204] Even if there were a violation of *Brady* that raised a question as to Wheeler incorrectly identifying who he was with earlier on the date of the incident, that would not negate the overwhelming evidence already existing against Miller.

In the alternative, Miller argues the State still had a duty to search JIC for relevant court background.[205] This simple search, Miller contends, would show the Family Court docket which reflects Bradley's custody on the day of the incident As previously stated, "*Brady* does not impose a duty on the prosecution to "ferret out any potential defense-favorable information from materials that are so disclosed."[206] Therefore, the Court does not find that the State suppressed evidence. Because the Court does not find that the State committed a *Brady* violation, the analysis does not need to reach whether the defendant was prejudiced. Nonetheless, the Court holds Miller would not be prejudiced without Bradley's custodial status. As discussed

---

[202] D.I. 202 p.10-11.
[203] *Id.* p.8.
[204] *Id.*
[205] D.I. 184 p.48.
[206] *U.S. v. Pelullo*, 399 F.3d 197, 212 (3d. Cir. 2005).

above, even though the Division of Youth Rehabilitative Services falls under the same umbrella as the Attorney General's Office, that mere overlap is not sufficient to find that the Division is a part of the prosecution's team.

Given these facts, the Court cannot find a *Brady* violation in the instant case. As such, there is no prejudice placed on Miller. Despite the fact that there is no *Brady* violation in this case, the *Brady* claim regardless is procedurally barred by Rule 61.[207]

## VI.  **ERLINGER**

In his supplemental Motion Miller raises a claim related to his conviction for possession of a firearm by a person prohibited. The State filed a Habitual Offender Motion as to this charge which the Court granted.  On this charge the Court pursuant to 11 *Del. C.* §4214A sentenced Miller to 25 years at Level V suspended after 10 years for five years at Level III.

This Court has denied Miller's claims for postconviction relief.  Therefore Miller's conviction for First Degree Murder remains in place.  The First Degree Murder conviction requires a life sentence without the benefit of probation or parole.

---

[207] Super. Ct. Crim. R. 61(i)(3).

Given this sentence Miller's *Erlinger* claim is not ripe.[208] Therefore this claim is dismissed as it does not create an actual controversy.

## VII.  <u>CUMULATIVE ERROR</u>

Miller's Claim V argues the cumulative impact of the above errors warrant reversal of his conviction and a new trial.[209] "Where there are multiple material errors in a trial, the Court must weigh their cumulative effect and determine if, combined, they are 'prejudicial to substantial rights [so] as to jeopardize the fairness and integrity of the trial process.'"[210] The Court must ask "whether [it] can be confident that the jury's verdict would have been the same."[211]

In the above analyses, the Court found none of the claims prejudiced Miller. This is in stark contrast to the holdings of the cases which Miller relies on.[212] Therefore, there is no cumulative impact of error which would undermine the Court's confidence in the jury's verdict.

## IV. <u>CONCLUSION</u>

---

[208] *State v. Kellan*, 317 A.2d 285, 300 (Del Super. 2024); *State v. Hearne*, 2023 WL 2980324 (Del. Super. 2023) *Govan v. State* 832 A.2d 1251 (Del. 2003); *State v. Twyman*, 2010 WL 4261921 (Del. Super. 2010).
[209] D.I. 184 p.64.
[210] *Starling*, 130 A.3d at 336 (quoting *Haskins v. State*, 102 A.23d 724, 735 (Del. 2014)).
[211] *Starling*, 130 A.3d at 336 (quoting *Kyles v. Whitley*, 514 U.S. 419, 453 (1995)).
[212] *See* D.I. 184 p. 64-66 (citing *Starling*, 130 A.3d at 336-37 (finding cumulative impact based on multiple claims of ineffectiveness); *Breakiron v. Horn*, 642 A.F.3d 126, 132 n.5 (3d. Cir. 2011) (finding cumulative error because three claims "individually warranted relief" and their cumulative impact did as well)).

Defendant's *Brady* violation claim, Cumulative Error claim, and multiple Ineffective Assistance of Counsel claims fall short and fail for the above stated reasons. The claim based on Erlinger is not ripe.

For the reasons stated herein, Defendant's Motion for post-conviction relief is **DENIED.**

**IT IS SO ORDERED.**

/s/ *Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

cc:    *Original to the Prothonotary*
Andrew Fletcher, Deputy Attorney General
Christopher S. Koyste, Esq.

41